UNITED STATES of America, Plaintiff-Appellee,

v.

Mohammad Ali BASTANIPOUR, Defendant-Appellant.

No. 81–2369.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1982.

Decided Dec. 30, 1982.

Certiorari Denied April 18, 1983. See 103 S.Ct. 1790.

James M. Shellow, Shellow, Shellow & Glynn, Milwaukee, Wis., for defendant-appellant.

William R. Coulson, Chief, Crim. Receiving and Appellate Div., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Defendant appeals from a conviction on three counts arising out of an alleged attempt to smuggle heroin from Iran into the United States. We hold: (1) that the Government's attempted pretrial appeal of a non-appealable order did not divest the district court of jurisdiction to try the case; (2) that a special agent's failure to retain the handwritten draft of a typed report did not violate defendant's rights under the Constitution or Jencks Act; (3) that the district court did not err in refusing to grant a mistrial when the special agent's testimony described a conversation not included in the report earlier disclosed to the defense; (4) that there was no error in instructing as to defendant's out-of-court statements; (5) that the Government's failure to furnish to the defense a copy of a computer program relating to expert testimony did not render the testimony inadmissible; (6) that defendant was not entitled to an evidentiary hearing concerning factually unsupported allegations of Government interference with the availability of an expert witness; (7) that the district court did not abuse its discretion in proceeding to trial without further waiting for responses to letters rogatory; (8) that cross-examination of defendant as to particular instances of conduct not charged was properly permitted. We therefore affirm defendant's conviction.

## I. The Facts

On April 15, 1980, Mohammad Ali Bastanipour, an Iranian citizen, arrived at Chicago's O'Hare International Airport on board a flight originating in Tehran, Iran. He was carrying with him 21 caviar tins which he claimed to have purchased as gifts for friends at a duty free shop in the Tehran Airport.

The caviar cans appeared to be hermetically sealed. Each was wrapped in tissue, tied with string, and sealed with a metal seal. In groups of three or four, the tins were bundled in tissue paper, and attached to each bundle was a torn piece of paper with characters written on it in the Farsi language. The bundled tins were contained in two green plastic bags.

Upon opening one of the bags, a Customs official at O'Hare noticed caviar on some of the tissue paper. Further investigation revealed that 20 of the 21 tins contained caviar at the top with false bottoms underneath and heroin beneath the false bottoms. In all there were 8.8 pounds of heroin, having a street value of over $9,800,000.

Bastanipour was indicted on three counts: importation of heroin, 21 U.S.C. § 952(a)(1); possession of heroin with intent to distribute, 21 U.S.C. § 841(a)(1); and making a false statement in a Customs Declaration, 18 U.S.C. § 1001. A jury returned verdicts of guilty as to each count, and post-trial motions for a new trial, for judgment of acquittal, and for arrest of judgment were denied by the district court.

Defendant now appeals from the judgment and the order denying his post-trial motions.

## II. The Merits

Bastanipour raises several arguments, but does not challenge the sufficiency of the evidence supporting his conviction on each of the three counts.

### A. Divestiture of Jurisdiction

Prior to trial, Bastanipour filed a motion entitled "Motion to Compel Cooperation of Government Personnel". His counsel alleged that he had located a Dr. Crown who appeared to be the only person in the United States qualified to compare Farsi handwritings. Dr. Crown asserted, however, that he was an employee of the Central Intelligence Agency and "that he could not testify on behalf of a defendant in a federal criminal case because his contract with the Central Intelligence Agency prevented him from testifying against the United States government." Defendant's motion sought "an order prohibiting the Central Intelligence Agency from enforcing the terms of

its contract" concerning such testimony. A minute order dated January 5, 1981 recited "Defendant's motion to compel cooperation of Government personnel is granted."

The Government moved for reconsideration, arguing lack of standing, lack of jurisdiction, and the like. The motion was denied, and the Government appealed. The district court's order was not stayed, Dr. Crown declined to go forward with examination and testimony, and Bastanipour obtained a different expert. The appeal remained pending until dismissed on Government motion after the trial.

Bastanipour argues, as he did to the district court, that the appeal divested the district court of jurisdiction of the case.

■ There is a general rule that an appeal suspends the power of the court below to proceed further in the cause, except to take such steps as will assist the appellate court in its determination. *Hovey v. McDonald,* 109 U.S. 150, 157, 3 S.Ct. 136, 140, 27 L.Ed. 888 (1883); *United States v. Lafko,* 520 F.2d 622, 627 (3rd Cir.1975).

The rule does not operate, however, where there is a purported appeal from a non-appealable order. *United States v. Garner,* 663 F.2d 834, 838 (9th Cir.1981); Moore's Federal Practice ¶ 203.11, at 3–51 (2d ed. 1982).[1]

■ We deem the order in this case not to have been appealable. It was not a final disposition of the case and was not within the list of orders made appealable by 18 U.S.C. § 3731 however liberally construed.

Government counsel apparently thought that the order enjoyed *Cohen* finality and was therefore appealable. *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *Cf. Abney v. United States,* 431 U.S. 651, 657, 97 S.Ct. 2034, 2039, 52 L.Ed.2d 651 (1977). We are not so persuaded. Although the order involved the Government's interest in its secrecy contract with an employee, it merely "granted" a somewhat vague motion. In order to be final under *Cohen,* an order must "finally determine claims of right separable from and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen, supra,* 337 U.S. at 546, 69 S.Ct. at 1225. *See also Wilk v. American Medical Ass'n,* 635 F.2d 1295, 1298 (7th Cir. 1980).

Even assuming *Cohen* finality and appealability so that the district court lost jurisdiction over the subject matter of the particular order, we conclude it still would have had jurisdiction over the merits of the case. *Akerly v. Red Barn Systems, Inc.,* 551 F.2d 539, 543 (3rd Cir.1977); *Silberman v. Bogle,* 486 F.Supp. 70, 72 (E.D.Pa.1980); Moore's Federal Practice ¶ 203.11 at 3–54.

---

1. Moore's Federal Practice states:

   [P]erhaps a majority of the courts of appeals have held that a notice of appeal naming an order that is not appealable can be ignored by the district court.... This appears to be the proper resolution of the issue.... An appeal not permitted by law may not be "taken" at all, and the court of appeals requires [acquires?] no jurisdiction of it. If the court of appeals acquires no jurisdiction, it seems to follow that the district court loses no jurisdiction that it otherwise would have.

   9 Moore's Federal Practice ¶ 203.11, at 3–51, 3–52 (emphasis deleted; brackets added). The discussion goes on to note that notwithstanding the above, some courts of appeals have held that actions of a district court after the filing of a notice of appeal of a non-appealable order are taken without jurisdiction and will be vacated. Among the cases cited in the margin is a Seventh Circuit decision, *Williams v. Bernhardt*

   *Bros. Tugboat Service, Inc.,* 357 F.2d 883 (7th Cir.1966). *Williams* dealt with the very narrow and different question of effect of a *nunc pro tunc* certification, under Rule 54(b), stating that a final order of judgment had been entered and that no just reason for delay of appeal existed. This court held that once an appeal has been taken from a non-appealable order, and a motion to dismiss filed in the appellate court, the district court lacks jurisdiction to belatedly grant certification.

   *Williams* has been seldom cited by this court and its rationale has not been extended to other contexts. Recently, its precedential value was seriously questioned in *Local P–171, Etc. v. Thompson Farms Co.,* 642 F.2d 1065, 1073 (7th Cir.1981), which appears to reach a contrary result on the same question that *Williams* addressed. To the extent that *Williams* retains any precedential vitality, we do not find it inconsistent with our present decision.

### B. Failure to Retain Handwritten Draft of Typed Report

■ Bastanipour claims that the destruction of a handwritten draft of a typed report by Special Agent Joseph P. Salvemini of the Drug Enforcement Agency (DEA) violated his constitutional right to confrontation, the Jencks Act, and express DEA policy. Accordingly, he argues that the agent's testimony should not have been admitted into evidence.

The record indicates that the agent interviewed Bastanipour at the airport following his arrest, but took no rough notes at that time. Instead, after the interview, the agent wrote a longhand draft of a report. That draft was given to a secretary for typing. When the agent received the typed version and compared it for accuracy, he discarded the longhand draft.

The district court, in its decision on the motion for a new trial, rejected the argument that the agent should not have been permitted to testify. The court noted that Bastanipour had been permitted to cross-examine the agent, without restriction, both at the hearings before trial and at the trial, and was able to show that Salvemini had violated a policy of the DEA. The court further observed that Bastanipour did not suggest "that any statements would have been contained in the handwritten notes which contradicted the damaging material in the typewritten report," but merely argued "that the matters omitted from the typewritten report would in some way had been revealed to him had the handwritten notes been preserved."

We agree with the district court that Bastanipour's right of confrontation was not abridged. The district judge allowed defense counsel to cross-examine the agent about his destruction of the handwritten draft, and on other matters. Defense counsel emphasized the point in closing argument, and the judge gave an instruction that the jury could consider the agent's action as going to the weight and credibility of his testimony. We cannot accept Bastanipour's argument that the agent, by destroying his draft, placed himself completely beyond the range of effective cross-examination.

■ Likewise, we find no violation of the Jencks Act. After a prosecution witness has testified on direct, the Government, upon request, is required to furnish the defense with any pre-trial statements of the witness which relate to the subject matter of his testimony. *See* 18 U.S.C. § 3500(b). In *United States v. Batchelder,* 581 F.2d 626 (7th Cir.1978), *rev'd on other grounds,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), we considered the question of whether a special agent's discarding of handwritten reports of meetings with the defendant, after the notes were typed, violated the Jencks Act. Relying upon our earlier decision in *United States v. Harris,* 542 F.2d 1283, 1292 (7th Cir.1976), we held there was no violation.

Unlike *Batchelder,* the handwriting here in question consisted of a first draft, rather than notes written at the time of the interview with the defendant. In both cases, however, there was testimony that the typewritten version contained all of the information that had been contained in the original writing.

Nor did the fact that DEA policy called for retention of the draft require suppression of the agent's testimony. Defendant's argument is based on a change in DEA policy which became effective on March 26, 1980, a few weeks prior to Bastanipour's arrest. From that date on, the DEA required agents to retain not only rough interview notes, but also the first drafts of typed reports for which no rough notes existed. According to Agent Salvemini, he was not aware of the new policy at the time his report was made, and acted in accordance with prior policy.

■ The destruction of the draft was an unwitting violation of DEA policy then in effect. The exclusionary rule does not apply, however, to the violation by law enforcement personnel of an agency regulation that is not mandated by the Constitution or federal law. *See United States v. Caceres,* 440 U.S. 741, 749–55, 99 S.Ct. 1465,

1470–73, 59 L.Ed.2d 733 (1979). *See also United States v. Feilbogen*, 494 F.Supp. 806 (S.D.N.Y.1980), *aff'd w/o op. sub nom., United States v. Lichtman*, 657 F.2d 265 (2d Cir.1981) (violation of DEA policy by destroying rough surveillance notes and rough drafts of reports did not require suppression of agents' testimony where virtually everything in agents' reports was placed before jury by other independent evidence).

### C. The Alleged Rule 16 Violation

■ There seems to be no dispute but that Bastanipour told Agent Salvemini at the airport that the cans of caviar appeared to be his; that he had purchased them in the duty-free shop in Tehran and brought them to the United States for friends; that he had written in Farsi on pieces of paper the names of the intended recipients and attached the slips to the tins. Bastanipour testified that he later, at the airport, told Salvemini that the names were "not the names that I put there." There was also expert testimony that the handwriting was not his.

The defense theory was that Bastanipour had in fact bought caviar and handwritten the labels in Tehran, but that during the flight unknown persons had substituted for his 21 wrapped and labeled tins 21 other tins, 20 of which contained heroin, and to all of which were affixed similar labels, handwritten by someone else. The plan would have to include recovery by the malefactors. Although at first Bastanipour had allegedly not realized there had been substitution and had acknowledged the seized tins, on subsequent close inspection he had seen that the labels were not his.

At trial, Agent Salvemini recounted Bastanipour's acknowledgement of the tins, but also testified "He fingered some labels at the top of the cans and indicated to me that these were the names of individuals that he was going to give the cans of caviar to as gifts here in the United States."

Bastanipour moved for a mistrial. The Government had furnished Salvemini's report before trial, apparently representing that it included the substance of statements made to Salvemini by Bastanipour. The acknowledgement of the labels while he "fingered" them had not been reported. The prosecutors represented that they, indeed, had not learned of this part of Salvemini's recollection until the morning of his testimony. Bastanipour claimed extreme prejudice from the undisclosed circumstances of the statement on the ground that it undercut his hypothesis of substitution by another. The reasoning seems to be that if Bastanipour fingered the labels and yet said that they identified the persons to whom the cans would be given, then he was either unreasonably unobservant or fabricated the switching scenario at a later stage. His own testimony was that he disavowed the labels when Salvemini called his attention to them.

Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure, requires the Government, upon request, to produce for the defense "the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant … in response to interrogation by any person then known to the defendant to be a government agent."

Subsection (d)(2) of the same Rule further provides that

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court *may* order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

(Emphasis added.)

As has been stated elsewhere with reference to Rule 16(d)(2):

> Discovery matters are committed to the sound discretion of the district court and an error in administering the discovery rules is reversible only on a showing that the error was prejudicial to the substantive rights of the defendant.

*United States v. Barnes,* 634 F.2d 387, 390 (8th Cir.1980), (quoting *United States v. Pelton,* 578 F.2d 701, 707 (8th Cir.1978)).

The district court judge denied the motion for mistrial, remarking "you had sufficient notice of the substance of the conversation and that even though you say you are taken by surprise, I do not believe there is the kind of prejudice in the testimony that would constitute grounds for a mistrial or a new trial."

Although the testimony suggests that Bastanipour was close enough to the labels to have observed they were not genuine, if they really were not, it is also true, as noted later by the trial court, that the testimony was consistent with Bastanipour's "theory that it was some time after the cans were opened at customs that he realized they had been switched for cans containing contraband."

We find no abuse of discretion in denying a mistrial or a new trial.

### D. The Jury Instruction Relating to the Defendant's Out-of-Court Statements

■ There was testimony of several statements made by Bastanipour during the course of interrogation. Arguably some of these statements would support an inference of guilt. There was a conflict in testimony whether some of the statements had been made. There was little to suggest that the statements, if made, were not voluntary.

The trial judge gave Bastanipour a choice of defense instruction number 28 or defense instruction number 52. He said he would not give both. Bastanipour chose number 28. It stated that "Such extrajudicial statements should always be weighed with caution because of the possibility of error in trusting to recollection testimony or oral utterances." It thus went to the issue of whether or not the statements had been made.

Number 52 was somewhat longer and similarly counseled that evidence relating to a statement outside of court "should always be considered with caution and weighed with great care." In addition, however, it emphasized inquiry whether the statement was "knowingly" made. Number 52 also contained language almost exactly incorporating the wording of 18 U.S.C. § 3501, that the jury should "give such weight to the confession as the jury feels it deserves under all the circumstances." Bastanipour contends that he was entitled to the language of number 52, and, in effect, that it was error to confine him to a choice between the two.

If Bastanipour wanted the language contained in 52 which did not appear in 28, we find it difficult to understand why he did not select 52. Like 28, it called for caution, and the usual instruction on credibility and weight was also given.

We find no reversible error under the circumstances in putting him to the choice.

### E. Admission of Expert Testimony

■ At trial, the Government's expert chemical analyst was permitted to give his opinion that the substance in the caviar tins contained heroin. This opinion was based on laboratory tests he performed and on information obtained by way of a computer. It was brought out on cross-examination that the expert did not recall the literature spectra upon which he based his analysis and that he had lost or destroyed the "standard" spectra which he had compared against the literature spectra. The expert also acknowledged that he knew nothing about the computer program which caused the computer to bring forth the information it produced.

Bastanipour claims that the failure of the witness to retain the laboratory standards and test results and the failure of the Government to disclose technical information concerning the patented computer programs of standard commercial laboratory instruments prevented defense counsel from conducting a meaningful cross-examination of the expert, as was needed to effectuate Bastanipour's confrontation right. We cannot agree.

Clearly, the trial court was within its discretion in admitting into evidence expert

testimony by the Government's chemist. *See generally* Fed.R.Evid. 703, 705. What question there is concerns matters of weight, not admissibility. The record indicates that defense counsel was able to attack the weight of the expert's opinion by calling attention to his failure to retain certain materials or information relating to the lab tests, and also his ignorance of the details of the computer program.

Concerning defense counsel's ability to conduct an effective cross-examination, the trial court wrote:

> To the extent the material [used to analyze the controlled substance] was available before trial, it was produced. The chemist apparently destroyed some of his records and forgot some of his scientific assumptions. Defendant's counsel took full advantage of this weakness in the government case. We can also assume without serious doubt that, had the missing data been produced, it would have been of no help to the defendant.[2] Here again defendant's counsel was able to use to full advantage the failure of the materials to be available. He was not prejudiced by their absence.

(Brackets and footnote added.)

Bastanipour cites several cases in support of his argument that the computer program relating to the test data should have been made available to the defense prior to trial so that it could prepare to conduct an effective cross-examination of the expert witness. These cases involved the admission in evidence of computer printouts or direct testimony of results rather than opinion testimony of an expert who had used what he characterized as recognized instrumental techniques involving the use of a computer, and are distinguishable on that ground. *See United States v. Dioguardi*, 428 F.2d 1033, 1038 (2d Cir.1970); *United States v. Russo*, 480 F.2d 1228, 1241 (6th Cir.1973); *United States v. Liebert*, 519 F.2d 542, 547 (3d Cir.1975); *cf. United States v. Weatherspoon*, 581 F.2d 595, 598 (7th Cir.1978).

Bastanipour quotes a conclusion of the dissenting judge in *Perma Research and Development v. Singer Co.*, 542 F.2d 111, 125 (2d Cir.1976), *cert. denied* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598. Judge Van Graafeiland, favoring reversal, expressed the opinion that where a computer is programmed to produce information for purposes of litigation, a court should not permit a witness to state the results without having the program available at trial, and should make the availability known in advance of trial. The court, however, affirmed. Mr. Justice Clark, writing the majority opinion, concluded that the trial judge had not abused his discretion in allowing the experts to testify, but commented that "it might have been better practice" to deliver the data and theorems in advance of trial. 542 F.2d at 115.

It is difficult to believe that, in the words of *Dioguardi*, 428 F.2d at 1038, there is "an appreciable risk that prejudice resulted." Not only did defense counsel reject the proffer of a sample for testing, the facts demonstrate that considerable effort was spent to conceal the white powdery substance under the false bottoms of the caviar tins. It is difficult, if not wholly unrealistic, to imagine that such energies would have been exerted if the matter in question were not extremely valuable contraband. Under defendant's elaborate switching hypothesis, which involved the intricate substitution of deceptively similar wrapped tins and handwritten labels, any other possibility would be even more remote.

### F. Alleged Government Interference with Expert Testimony

Given Bastanipour's claim that he had written the labels in Tehran, it was important for him to show the labels on the seized cans were not written by him. Defense counsel sought to obtain Dr. Crown as an expert witness to testify accordingly. To that end, as mentioned earlier, defense counsel, in January 1981, secured the order

---

2. This assumption may have related to the fact that defense counsel was offered the opportunity to test a sample of the heroin, but declined.

Of course, the burden of proving that the substance was heroin rested on the Government.

relating to Dr. Crown's agreement with the CIA. Shortly thereafter Dr. Crown informed defense counsel concerning another qualified witness. When the defense contacted Dr. Crown, in March 1981, the doctor stated that he did not want to have any part in the proceedings, that his decision was made for personal reasons, not as the result of any coercion or intimidation.

After receiving this information, the trial judge indicated that he was willing to hear any testimony concerning Government interference with Dr. Crown's decision. The court's post-trial opinion reveals that a formal evidentiary hearing was not ordered because "defendant ... [was] vague as to what evidence might thereby be adduced," and had "made no offer of proof concerning the absent witnesses." The court also noted that Bastanipour was not prejudiced by the absence of Dr. Crown because he "was able to replace Dr. Crown's testimony by a qualified witness." The Government did not contest that witness' testimony.

We cannot agree with the defendant that the trial court's failure to grant an evidentiary hearing constituted reversible error or an abuse of discretion under the circumstances. Neither do we agree that there is any need for a remand for the purpose of an evidentiary inquiry now.

### G. Alleged Interference with Letters' Rogatory

■ Bastanipour wanted to strengthen his defense at trial by securing testimony from the superintendent of the caviar shop at the Tehran Airport that would establish that he obtained sealed caviar containers in a lawful manner to bring with him on the flight to the United States. However, because American diplomats were held hostage in Iran between November 4, 1979, and January 20, 1981, and diplomatic relations between the countries had been broken off, the production of the superintendent as a live witness at trial seemed imprac-

tical. As an alternative, the defense wished to secure written testimony through the use of letters rogatory.[3]

Although the surrounding facts are more complex, the crux of the defendant's contention seems to be that the State Department did not act upon the application to approve and transmit the letters rogatory with sufficient dispatch to permit him to secure the desired testimony for use at trial.

The record indicates that the district court delayed commencement of the trial for several months to allow time for the letters rogatory to be transmitted and returned. Given the strained relations between Iran and the United States, the likelihood of a reasonably prompt response was never very good. We do not think the trial court was obliged to postpone commencement of trial indefinitely. The court's post-trial decision stated in part: "[The] letters rogatory are still in the process of being answered, to the extent the defendant believes they may be of value to him.... If the letters rogatory are ever answered, he still has the possibility of obtaining a new trial."

### H. Evidence Relating to Reputation and Credibility

■ Defendant argues that the district court erred in permitting cross-examination of defendant concerning acts which suggested fraud and dishonesty on his part. We think it sufficient to observe that Bastanipour had placed his credibility in issue by taking the stand and his character in issue by calling character witnesses, and that the cross-examination challenged related to one or both of these subjects. The trial court did not abuse its discretion.

### III. Conclusion

In our consideration of the issues raised on appeal we have taken note of Bastanipour's suggestion that "the lot of an Iranian on trial in an American court during

---

**3.** Letters rogatory are a request by a court of one country to a court of another country asking the answering court to locate a person within its jurisdiction and obtain answers to written questions. The letters rogatory are transmitted between courts by their respective governments. *See* Black's Law Dictionary 815 (5th ed.).

1980/1981 is not an easy one." The trial did occur a scant two months after the return of the American hostages from Iran, and the events of the Hostage Crisis were doubtless fresh in memory. We conclude, however, that Bastanipour was fairly tried and convicted.

Accordingly, the judgment appealed from is AFFIRMED.