**UNITED STATES of America, Appellee,**

v.

**Gregory HINTON, Appellant.**

No. 82–5268.

United States Court of Appeals, Fourth Circuit.

Argued May 13, 1983.

Decided Oct. 17, 1983.

Certiorari Denied Feb. 21, 1984. See 104 S.Ct. 1300.

---

1. *Cf.,* however, Fed.R.Crim.Pro. 35 on correcting illegal and illegally imposed sentences and on reducing sentences.

Fred Warren Bennett, Federal Public Defender, Baltimore, Md. (Richard B. Bardos, Law Clerk on brief), for appellant.

Glenda G. Gordon, Asst. U.S. Atty., Baltimore, Md. (J. Frederick Motz, U.S. Atty., Baltimore, Md., on brief), for appellee.

Before RUSSELL, PHILLIPS and MURNAGHAN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The defendant appeals his conviction of armed bank robbery in violation of §§ 2113(a), (b), (d) and (f), 18 U.S.C. and § 2, 18 U.S.C. He asserts three grounds of error. The first of these is addressed to his conviction of an assault by putting "in jeopardy the life of any person by the use of a dangerous weapon" during an armed robbery (§ 2113(d)). The evidence in this connection was that one of the three bank robbers, brandishing and waving a large revolver toward the employees and customers in the bank, threatened them while his confederate gobbled up the money from the tellers' boxes. The defendant argues that such evidence is insufficient to convict under § 2113(d). Recently, in *United States v. Bennett*, 675 F.2d 596, 598–99 (4th Cir. 1982), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2306, 73 L.Ed.2d 1307, we thoroughly canvassed this question and concluded to the contrary. We adhere to that decision. His second claim relates to the admission in evidence of the spontaneous comment of the interviewing officer after the defendant had told the officer, "I'll cop to the (b)."[1] The officer's response was: I told him this was a lesser charge and that it carried a ten-year maximum penalty." Such response of the officer, according to the defendant, represented inadmissible hearsay. We are of opinion that this contemporaneous response came within the exception to

---

1. The comment by the defendant attested to his familiarity with the statutory crime of bank robbery.

the hearsay rule stated in Rule 803(1), Federal Rules of Evidence. In addition, any possible error in the admission of such response was rendered harmless by the defendant's own subsequent repetition of the officer's explanation of the meaning of defendant's comment. The defendant's third claim of error, however, requires some discussion. It involves a charge of failure to produce statements which the defendant argues should have been preserved and made available for impeachment during the cross-examination of the Government witness Sexton under the terms of § 3500, 18 U.S.C. which authorizes penalty of suppression of a witness' testimony by way of a sanction for a violation of such statute. Before addressing this legal issue, it appears proper first to sketch the factual situation from which this issue emerges.

In minutes after it opened on the morning of May 5, 1982, the Citizen's Bank & Trust Company of Maryland, Kemp Hill Branch, in Silver Spring, Maryland, was robbed by three black males, wearing ski masks. As we have already said, one of the robbers had a large gun which, as the robbers rushed into the bank, he brandished in a threatening manner, commanding the customers in the bank to "hit the floor." The other two robbers jumped over the teller counter and ordered the tellers to get down. They proceeded to gather up $12,504 in federally insured funds, which included bait bills. All the robbers then rushed from the bank and jumped into a light blue 1979 Chevrolet Caprice which had been stolen that morning, presumably for use in the robbery. A person in the bank parking lot saw the robbers rush from the bank and take off in the Caprice. He followed the Caprice to the parking lot of a nearby apartment complex where the robbers parked the Caprice. The occupants of the Caprice had apparently observed they were being followed and one of them, after they got out of the Caprice, approached their pursuer in a belligerent manner and so frightened him that he fled. The three robbers proceeded at this point to transfer to a brown van parked in the apartment parking lot, abandoning the stolen Caprice.

Thomas Spaight, who lived in the apartment complex, was in his car at the time and was beginning to drive out of the apartment parking lot. He had observed the unusual action of the robbers in the lot as they shifted from the Caprice to the van and, curious, he drove his car in front of the van so as to secure an opportunity to observe the van's license plate. He apparently immediately passed the van's license plate number on to the police authorities.

By 9:30 on May 5, within a few minutes after the robbery, the owner of the van had been identified by the police authorities on the basis of Mr. Spaight's information, and Williams, a police officer in the District of Columbia, was ordered to establish a lookout on the block in Washington, D.C., where defendant, who had been identified as the owner of the get-away van, lived. After about an hour, Officer Williams observed a brown van with the license tag identified by Mr. Spaight drive into the block where defendant lived. The driver of the van, identified as the defendant, double-parked in the street while he ran into the house, said to be that of the defendant. The defendant quickly returned from the house to his van and drove it farther down the block where he could park it. As the defendant emerged from the van, he was arrested by Special Agent Chmiel of the FBI, who together with Sergeant Dory of the District of Columbia Metropolitan Police Department and Special Agent Sexton, had joined Officer Williams at the scene. A search of the area about the scene of the arrest revealed a pillow case, in which there were $3,924 in money, some ammunition, and a .357 Strum Ruger pistol. Included in the money was money identified as bait money taken from the bank during the robbery. The defendant's fingerprints were found on the bait money. The gun was said by witnesses later at the trial to be similar to the one brandished by the robber during the robbery. It, too, had defendant's fingerprints on it.

After the arrest was made, Agent Sexton was instructed to do "a neighborhood investigation." In the course of that investiga-

tion, he interviewed Alice Lemmons, who lived on the same block a few doors from the defendant's residence. Lemmons was seated on her front porch at the time of the interview. Agent Sexton wrote on a small sheet of paper a rough note of what Lemmons told him in the course of his interview of her. Later the same day he set forth on a formal Interview Form FD–302, his account of his interviews, including that of Lemmons, using his rough notes of her statement to assist in the drafting.[2] This formal 302 statement, so far as it relates to the agent's interview of Lemmons, is:

> "Lemmons advised that she knows Hinton and she had just seen him drive up in his brown van. Lemmons stated that Hinton spoke to her in passing. He said hello, sugar. She returned inside her residence for a couple of minutes to cook Oodles of Noodles for her child. Upon returning outside she saw Hinton being placed under arrest. She added she had not seen Hinton earlier that morning."

At the trial Lemmons was called as a witness for the defendant. She admitted that she had seen the defendant on the morning of May 5 before his arrest. She fixed the time when she saw him first as about 9:30 to 9:45. She denied that, when she saw him, he was driving a brown van. According to her trial testimony, he, while simply standing in the street, waved at her and said "Hello Sugar." Agent Sexton was called as a government witness to rebut some of Lemmons' testimony. He testified, as he had recorded in his 302 interview report, that Lemmons told him when he inquired of her about this event that "she had seen him (referring to the defendant) prior to his arrest, he had driven by in his brown van, he had waved at her and said

hello, sugar." The point of difference between Lemmons' trial testimony and Sexton's record of her statement to him on the day of the robbery was whether the defendant was driving the brown van when he waved to her that morning or was standing on the sidewalk.

During his testimony at trial, Sexton was asked, after he had given his account of his conversation with Lemmons as recorded in his 302 report, whether he had been "taking notes" while interviewing Lemmons. He answered he had. Counsel for the defendant then inquired where such notes were. The agent responded, "[t]hey should be in the 1–A folder with the case file." A recess was taken to enable the agent to search his files. The notes could not be found, though it seems to be conceded that the agent had "placed (the notes) in the 1–A folder," which he had given to a clerk whose job it was to place them in "the file of the Washington Field Office." The defendant at this point moved to suppress the testimony of Agent Sexton because of the failure to produce the rough notes of the interview of the witness Lemmons.

There is no charge that the Government had deliberately destroyed or concealed the notes. Neither is it contended that the Government had not made a good faith effort to preserve the notes. The position of the defendant, as stated both at trial and in this Court, is that, while the Government may have sought in good faith to retain in its files the notes of all interviews of potential witnesses made during the investigation at the scene of defendant's arrest including those of the interview of Lemmons, those notes had been "negligently" or inadvertently lost and were not available.[3] The

---

**2.** The 302 form was developed by the Department in response to the decision of the Supreme Court in *Jencks v. United States,* 353 U.S. 657, 668–70, 77 S.Ct. 1007, 1013–1014, 1 L.Ed.2d 1103 (1957), and was "used to record and preserve the final copy of a witness's statement whenever it is anticipated that the witness might testify in court." The actual procedure to be followed in preparing such report for the purpose of complying with *Jencks,* and, later, the Jencks Act, is detailed in *United*

*States v. Harrison,* 524 F.2d 421, 425–26 (D.C. Cir.1975).

**3.** The inability to produce interview notes which, though lost, "were not 'lost' in bad faith" has been held in some cases not to be a ground for suppressing the agent's testimony. *United States v. Williams,* 384 F.2d 488, 493 (2d Cir.1966), *cert. denied,* 385 U.S. 836, 87 S.Ct. 84, 17 L.Ed.2d 71. *To the same effect, see United States v. Arra,* 630 F.2d 836, 848–50 (1st Cir.1980); *United States v. Calhoun,* 542 F.2d

defendant argued that under those circumstances the District Court was obligated to invoke sanctions against the Government under the Act by suppressing the testimony of the agent Sexton. The district court, however, refused to strike the testimony, relying for its decision on *United States v. Johnson*, 337 F.2d 180 (4th Cir.1964), *cert. denied*, 385 U.S. 846, 87 S.Ct. 44, 17 L.Ed.2d 77 (1966). It is this ruling which the defendant claims to be in error and which presents an issue for decision by us on this appeal.

The right of a criminal defendant in federal court such as the defendant to compel the production of the written statement of a government witness for impeachment purposes under penalty of sanctions was first enunciated in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), not as a "constitutional" requirement, *United States v. Augenblick*, 393 U.S. 348, 356, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969), but as an exercise of the court's power, "in the absence of statutory provision, to prescribe procedures for the administration of justice in the federal court," *Palermo v. United States*, 360 U.S. 343, 345, 79 S.Ct. 1217, 1221, 3 L.Ed.2d 1287 (1959). Congress, however, became concerned with the later "expansive reading of *Jencks*" by federal courts, *Id.*, at 350, 79 S.Ct. at 1223, and chose by enacting § 3500, 18 U.S.C., in 1957 to "exercise its [own] power to define" the material producible for purpose of impeachment in a criminal trial in the federal courts,[4] in order "to exclude from that definition various kinds of material which lower federal courts had been requiring the Government to produce because they had misinterpreted the narrow holding of the *Jencks* case itself." [5] Accordingly, since its

enactment, that Act "and not the *Jencks* decision governs the production of statements of government witnesses for a defendant's inspection at trial," *Rosenberg v. United States*, 360 U.S. 367, 369, 79 S.Ct. 1231, 1233, 3 L.Ed.2d 1304 (1959), and is "the exclusive, limiting means of compelling for cross-examination purposes the production of statements of a government witness to an agent of the Government," *Palermo*, 360 U.S. at 350, 79 S.Ct. at 1223.

The critical sentence in the statement of the Jencks Act is, as the Court has declared in *Goldberg v. United States*, 425 U.S. at 122, 96 S.Ct. at 1353,[6] that identifying when a "statement" of a witness, as recorded by the Government Agent qualifies as a statement within the intendment of the Act and must be preserved under the possible statutory penalty sanction. As Justice Powell stated in his concurring opinion, "the Act provides no procedure for resolving questions about whether a particular document is a 'statement'." [6] Justice Stevens, in his concurring opinion, points out that the statutory definition of "statement" is "in two parts, encompassing originals of statements made by the witness (18 U.S.C. § 3500(e)(1)) and verbatim or substantially verbatim copies (§ 3500(e)(2))".[7] Both Justice Powell and Justice Stevens, however, agreed in that case that notes of a witness' statement "is not a statutory 'statement' unless it reflects the witness' own words fully and without distortion" and is to be treated as such "only upon a 'finding of unambiguous and specific approval' of specific notes." [8] This statement is in accordance with the very precise and circumscribed language of the statute itself which provides that only "a written statement made by said witness and signed or other-

---

1094, 1104 (9th Cir.1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977); *N.L. R.B. v. Seine and Line Fishermen's Union of San Pedro*, 374 F.2d 974, 979 (9th Cir.1967); *cf., however, Lee v. United States*, 368 F.2d 834, 837–38 (D.C.Cir.1966). We prefer, however, not to ground our decision on that point but rather on the absence of an obligation of the Government to preserve such notes.

**4.** 360 U.S. at 348, 79 S.Ct. at 1223.

**5.** *Goldberg v. United States*, 425 U.S. 94, 112, 96 S.Ct. 1338, 1349, 47 L.Ed.2d 603 (1976) (Stevens, J., concurring).

**6.** 425 U.S. at 122, 96 S.Ct. at 1353–1354.

**7.** 425 U.S. at 112, 96 S.Ct. at 1349.

**8.** 425 U.S. at 112 and 125, 96 S.Ct. at 1349 and 1355.

wise adopted or approved by him" is subject to compelled production thereunder, § 3500(e)(1).

Immediately after the enactment of § 3500, the Department of Justice prepared and issued instructions to the agents of the Federal Bureau of Investigation on their obligations under the Act and particularly on what "statements" were within the Act. In its instructions it declared that the Act did not require an agent to retain the rough interview notes made of a witness' statement which are incorporated in the agent's later formal interview 302 report [9] but that the formal 302 interview report of the rough notes alone was required to be preserved, subject to production under the Act. This view of the Department of Justice was afforded confirmation in a dictum in the dissenting and concurring opinion of Justice Frankfurter in *Campbell v. United States,* 365 U.S. 85, 102, 81 S.Ct. 421, 430, 5 L.Ed.2d 428 (1961):

> "Nothing in the legislative history of the Act [*i.e.,* § 3500] remotely suggests that Congress' intent was to require the Government, with penalizing consequences, to preserve all records and notes taken during the countless interviews that are connected with criminal investigation by the various branches of the Government."

This dictum of Justice Frankfurter is reinforced in the subsequent case of *Killian v. United States,* 368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961), where the Court dealt with the specific question whether notes made by a government agent

"only for the purpose of transferring the data thereon" to a more formal record later qualified for production as Jencks Act material. It indicated that such interim notes need not be preserved for production in the event the agent testified at the later trial. Thus, it said:

> "If the agents' notes of [the witness's] oral reports of expenses were made only for the purpose of transferring the data thereon to the receipts to be signed by [the witness], and if, after having served that purpose, they were destroyed by the agents in good faith and in accord with normal practice, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive [the defendant] of any right."

Later, in *United States v. Augenblick,* 393 U.S. 348, 354–55, 89 S.Ct. 528, 532–533, 21 L.Ed.2d 537 (1969), the Court considered the productibility under § 3500 of the " 'rough pencil notes' " jotted down by a Government agent in an interview of one of the Government's witnesses in the case. These notes were not sought for production as the statement of the Government agent himself as in the case here, but for use in impeachment of the witness whose statement was allegedly set forth in the " 'rough pencil notes.' " The Court, however, characterized the notes as a statement not of the "entire interview" but only of "a truncated version." As incomplete statements of "the entire interview," the Court sustained the refusal of the district judge to order production of the rough notes, saying:

**9.** Though the Department has now reluctantly accepted a policy whereby it attempts to preserve such notes, it has done so because of the decisions in *Harrison v. United States, supra,* 524 F.2d at 425–26 and *United States v. Harris,* 543 F.2d 1247 (9th Cir.1976), but as the Department emphasized in its brief, in *United States v. Vella,* 562 F.2d 275–76, n. 1 (3d Cir.1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978), (discussed later herein), it did not accept the ruling in those cases, as either proper or compelled, believing that "this added burden (imposed by requiring the preservation of such notes as provided in those decisions) on law enforcement is unnecessary and should eventually be declared such in order

that resources soon to be dedicated to the preservation of rough notes can be better used." The fact, however, that, despite this new policy of the Department, and the departmental regulations to preserve such notes, investigative notes may have been destroyed, either inadvertently or intentionally, contrary to such departmental regulation, will not require exclusion of the agent's testimony either under the Act or the Constitution. *United States v. Bastanipour,* 697 F.2d 170, 174–75 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1790, 76 L.Ed.2d 358, *see, also, United States v. Caceres,* 440 U.S. 741, 749–54, 99 S.Ct. 1465, 1470–1472, 1473, 59 L.Ed.2d 733 (1979).

"Moreover, we said in *Palermo v. United States, supra,* [360 U.S.] at 353 [79 S.Ct. at 1225], that the administration of the Jencks Act must be entrusted to the 'good sense and experience' of the trial judges subject to 'appropriately limited review of appellate courts.'"

While not conclusive, these statements of the Supreme Court as set forth in the cases discussed, appear to intimate somewhat definitely that rough interim notes of a government agent, when later incorporated in the agent's formal interview report, are not "written statements" within the Act and need not be preserved. It is not, therefore, unexpected that the majority of the Circuit Courts which have confronted directly this issue has held that such interim interview notes are not required to be preserved or produced under the Act. In fact, the author of a 1972 Note, *Judicial Response to Governmental Loss or Destruction of Evidence,* 39 U. of Chic.L.Rev. 542, 549 (1972), confirmed that such an application of the Act had been "uniformly followed" in "[l]ower federal courts." And, within the last year, the author of the Note, *Interview Notes of Government Agents Under the Jencks Act,* 80 Mich.L.Rev. 1695, 1697 (1982), though not sympathetic to the majority rule, conceded:

"Most courts that have considered the issue have concluded that the Jencks Act does not require the government to retain and produce rough interview notes."

In amplifying on this statement, the author added by way of a footnote:

"In fact, only the D.C., Third and Ninth Circuits have held that there *is* a duty to retain notes. *See United States v. Vella,* 562 F.2d 275 (3d Cir.1977); *United States v. Harris,* 543 F.2d 1247 (9th Cir.1976); *United States v. Harrison,* 524 F.2d 421 (D.C.Cir.1975). [These three cases cited as constituting the minority view, are later discussed herein in some detail]. In the other circuits 'the FBI practice of destroying rough interview notes has generally been sanctioned by the courts in cases involving Jencks Act issues . . . .' 543 F.2d at 1251." (Emphasis in text).

Further, in *United States v. Harrison, supra,* Judge Wright has listed a large number of decisions from the Second, Fourth, Fifth, Sixth, Seventh, Eighth and Tenth Circuits upholding the majority rule.[10] To this we add in the note below a number of decisions subsequent to *Harrison* in which the Circuit Court has adhered to the majority rule.[11]

Most of the cases following the majority rule rely on what they perceive to be the history, purpose and phrasing of the Act. *See United States v. Kuykendall,* 633 F.2d 118, 119 (8th Cir.1980); [12] *United States v. Comulada,* 340 F.2d 449, 451 (2d Cir.1965); *United States v. Thomas,* 282 F.2d 191, 194 (2d Cir.1960). They conclude that "rough notes" or "jottings" "not intended as a final report" made during an investigation by a government agent to "serve only a limited

---

**10.** 524 F.2d at 430, n. 25.

**11.** *United States v. Bastanipour,* 697 F.2d 170, 174–75 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1790, 76 L.Ed.2d 358, *United States v. Kuykendall,* 633 F.2d 118, 119 (8th Cir.1980); *United States v. Williams,* 604 F.2d 1102, 1116–17 (8th Cir.1979); *United States v. Batchelder,* 581 F.2d 626, 635 (7th Cir.1978), *rev. on other grounds,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *United States v. Shovea,* 580 F.2d 1382, 1389–90 (10th Cir. 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979); *United States v. Martin,* 565 F.2d 362, 363–64 (5th Cir.1978); *United States v. Mase,* 556 F.2d 671, 676 (2d Cir.1977), *cert. denied,* 435 U.S. 916, 98 S.Ct. 1472, 55 L.Ed.2d 508 (1978); *United States v. Anzalone,* 555 F.2d 317, 321 (2d Cir.1977), on rehearing

on another issue, 560 F.2d 492 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. McCallie,* 554 F.2d 770, 773 (6th Cir.1977); *United States v. Harris,* 542 F.2d 1283, 1292 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1973).

**12.** In *Kuykendall,* the Court said, 633 F.2d at 119:

"The Jencks Act has been interpreted to impose no duty upon law enforcement officers to retain their rough, handwritten notes after the contents have been incorporated into more formal reports and the reports are checked for accuracy, especially when the notes have been destroyed in good faith." [Quoting from *United States v. Williams,* 604 F.2d at 1116].

and temporary purpose" of providing a "guide" for the agent's subsequent formal interview report [13] in "transferring the information [on the notes]" to other data and "not intended as a final report," [14] lack that element of finality and completeness required to meet the test of an "approved" statement of the agent under the precise and circumscribed definition stated in the Act. Under this reasoning, it is not impermissible to destroy the notes when they have been transferred to the formal interview report since it is the formal report which becomes in such circumstances the "approved" statement required under the Act to be preserved and to be producible on demand.

Many courts find justification for this result because of the burdensomeness, if not the impossibility of the Government preserving every note or "jotting" made by an officer in the course of a criminal investigation as balanced against the minimal likelihood of distortion or incompleteness of the formal interview report of the agent. This reasoning was expressed in *United States v. Comulada, supra,* 340 F.2d at 451:

> "... Indeed, every consideration of efficiency and economy would seem to require the destruction of such fragmentary memoranda as soon as they are no longer needed. Where every sensible motive supported destruction and no reason was advanced to suppose that the destruction was for an improper purpose, it would have been a needless waste of time to permit a *voir dire* inquiry."

This point was reiterated in *United States v. Carrasco,* 537 F.2d 372, 377 (9th Cir.1976), where the Court said: "The benefits to defendants in those few cases in which revision produces substantial distortion may not justify the costs of retaining all rough notes in all cases." More recently *United States v. Spencer,* 618 F.2d 605, 607 (9th Cir.1980) voiced in somewhat more detail the same view:

> "The retention requirements implicit in Spencer's proposed reading of the Jencks Act are potentially staggering. Besides retaining every scrap of paper that could be required, the same logic would dictate that all original tapes of conversations would also have to be maintained. The result from a policy standpoint would be the creation of an unwieldy national attic of scrap paper and magnetic tape which would not advance the cause of justice."

Moreover, the authorities declare that in any event it is only when there is some basis for a finding that there has been distortion in the transfer of the information from the rough notes to the formal interview report that the destruction of the rough notes will require suppression of the impeaching evidence or a new trial. *See United States v. Fruchtman,* 421 F.2d 1019, 1021–22 (6th Cir.1970), *cert. denied,* 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86; Note, *Judicial Response to Governmental Loss or Destruction of Evidence,* 39 U. of Chic.L. Rev. at 549–50.

It would seem, as the District Court ruled in this case, and as Judge Wright in *United States v. Harrison (see* 524 F.2d note 25, p. 430) appeared to assume, that this Circuit, when confronted with the issue in question, has followed the majority rule. In *United States v. Johnson,* 337 F.2d at 201–02, the FBI agents had interviewed two witnesses, one being the defendant and the other a witness for the defendant such as Lemmons, making notes during the interviews. The agents "returned to [their] office, and, from these notes, dictated a narrative statement [of the interview] which was subsequently typed ...." After dictating the narrative statement, the agents destroyed their interview notes. They were called as witnesses to rebut the in-court testimony of the witnesses. The defendant objected. The objection raised the question whether such destroyed interview notes qualified as a "statement" under (e) of the Act and as such should have been preserved and pro-

---

**13.** 340 F.2d at 451.

**14.** *United States v. Kaiser,* 660 F.2d 724, 731–32 (9th Cir.1981), *cert. denied,* 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674.

duced. After suggesting that the retention of such notes might be the prudent act in any event, the Court said: "*However this may be,* as we view the Jencks Act, the notes in question do not qualify either as a 'statement' or as a 'report' as these terms are defined in the Act." (Italics added) It followed, as the Court held in that case that the agents were properly allowed to testify in impeachment of the witnesses' testimony, even though their investigative notes themselves had been destroyed.[15]

The decision in *Johnson* was followed subsequently in *United States v. Missler,* 414 F.2d 1293, 1304–05 (4th Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970). In that case, two government agents, while listening unobserved to conversations between the defendant and another party, made, to quote in detail the facts as recorded in the opinion, "sketchy handwritten notes. These notes contained an abbreviated version of the conversation. Returning to the F.B.I. offices, the agents immediately prepared a formal report .... In the preparation of this report, they relied on their memories and on the notes. After satisfying themselves that their report was a full and accurate statement of the day's events, they destroyed the notes. The only explanation offered was that destruction of notes of this nature was a 'common practice.'" The defendant raised the claim that the "handwritten notes" were Jencks material which the Government was obligated to produce and that "without them he could not effectively cross-examine the agents and suggests that it is impossible for the court to be certain that the agents did not, in the preparation of the formal report, improve upon their notes." The Court responded to this argument:

> "We do not join in this insinuation, but we do agree that the F.B.I.'s practice is subject to criticism and introduces opportunity for the assertion of doubt. Reten-

tion of the notes would foreclose many attempts to impeach F.B.I. agents' reports. *Notwithstanding this, we think appellant is not entitled to relief because the notes in question do not fall within the statute.*" (Italics added)

In *United States v. Crowell,* 586 F.2d 1020 (4th Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979), we were faced more recently with the same contentions as were advanced in *United States v. Harrison, supra,* 524 F.2d 421. Though we did not discuss specifically the Jencks Act issue but chose to deal particularly with the *Brady* argument, we found inferentially that the production of the agent's formal 302 report satisfied the obligations of the agents and specifically complied with *Brady.* We, accordingly refused to suppress the agent's testimony for failure to produce his rough preliminary interview notes.[16]

There are decisions which hold that preliminary interview notes such as those involved here must be preserved as "statements" within the intent of § 3500(e)(1). The decisions cited in support of this minority view are said to be represented by three decisions from the D.C., Third and Ninth Circuits already listed in our quote from 80 Mich.L.Rev., at 1697, n. 45 as establishing the minority view in the Third, Ninth and D.C. Circuits. *In the Project: Twelfth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1981–1982,* 71 Geo.L.J., 449 and 520, n. 1213, the author apparently assumes, on the basis of his construction of *United States v. Sanchez,* 635 F.2d 47 (2d Cir.1980), that the Second Circuit had abandoned its long line of cases adopting the majority rule, many of which were listed in *Harrison,* and had chosen to align itself with this minority view. An analysis of the decisions in which this identification of these Circuits as dissenters from the majority rule was made does not seem to justify the complete ac-

---

**15.** 337 F.2d at 202.

**16.** *United States v. Derrick,* 507 F.2d 868, 871 (4th Cir.1974) is not in point here because the notes in question there were concededly "writ-

ten statements." The issue in that case was whether the unproduced statements were "material" to defendant's defense.

ceptance of these decisions as such—certainly *Sanchez* cannot be treated to be such and the decisions of the Ninth Circuit and the Third Circuit are not entirely clear to the point. We shall discuss each of those cases generally cited as illustrative of a contrary view among the Circuits.

It seems appropriate to look first at *Harrison,* since it appears to be the bellwether decisions which at least *Vella* and *Harris,* though not *Sanchez,* purport to follow. The decision in *Harrison,* however, did not rely simply on the Jencks Act for its conclusion on this point: actually it rested its decision as much, if not more, on the rule in *Brady* [17] as that rule had been interpreted by that court in *United States v. Bryant,* 439 F.2d 642, 652 (D.C.Cir.1971), and on Rule 16, Fed.R.Crim.P. That this is so is clearly shown by the court's answer to the Government's argument to the effect that preliminary interview notes of an investigating officer were "not discoverable under the Jencks Act." The Court's response to this contention was (524 F.2d at 429):

> "The short answer to this contention is simply that the duty of preservation, as we have already shown, does not rest only on the Jencks Act. As *Bryant* made abundantly clear, the duty rests as well on the *Brady* requirement that material favorable to a defendant be disclosed, and to a lesser extent on Rule 16, Fed.R.Crim. P."

It was because of this ambiguous statement in *Harrison* that the Court in *United States v. Lieberman,* 608 F.2d 889, 896, n. 13 (1st Cir.1979), *cert. denied* 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980), when confronted with the citation of *Harrison* as authority for the proper construction of the Jencks Act, appropriately commented:

> "Because the *Harrison* holding was based upon Fed.R.Crim.P. 16 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we do not find it particularly enlightening on the Jencks Act issue in this case, and we need not consider whether we would follow *Harrison* or adhere to the views we expressed

in *Campbell v. United States,* 296 F.2d 527, 531–32 and n. 8 (1st Cir.1961)."

Since the defendant here does not raise a *Brady* claim (which, incidentally, would have been foreclosed by our *Crowell* decision, discussed *supra*) or assert a right under Rule 16, *Harrison* is not specifically in point in a case such as that under review here.

Turning now to *United States v. Harris, supra,* 543 F.2d 1247, the Ninth Circuit in that case reaffirmed its earlier decision in *United States v. Johnson,* 521 F.2d 1318 (9th Cir.1975), and announced (p. 1253): "we follow the *Harrison* case in holding that the original interview notes, especially relating to an FBI agent's interview with the accused, must be preserved." It bulwarks its conclusion by planting its conclusion, just as had *Harrison,* on *Brady* and Rule 16. But that Circuit's adherence to the *Harrison* case in subsequent cases has at least been somewhat ambivalent. Thus, though it has continued to cite *Harris* in these cases, it seems, when confronted directly with a contention under the Jencks Act, to have found that the destruction or loss of preliminary investigative notes was not violative of the Act. Two of these later Ninth Circuit cases involved the destruction of handwritten notes which (after being corrected) were later typed and, as typed, were signed by the interviewing agent as his interview report. *United States v. Bagnariol,* 665 F.2d 877 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982), and *United States v. Kaiser,* 660 F.2d 724 (9th Cir.1981). In both of these cases, the defendant moved to suppress the agent's testimony because the handwritten notes were not produced. In *Kaiser* (660 F.2d at 732) the Court said that the rough draft there "was neither intended as a final statement nor as simply a contemporaneously written factual account of what a witness said. But *see Harris,* 543 F.2d 1252. It was, therefore, not 'adopted or approved' by agent Taylor within the meaning of 18 U.S.C. § 3500(e)(1), and thus was not producible." In *United States v.*

---

**17.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Spencer,* 618 F.2d at 606 (1980), the same Court said that the interviewing agent's rough notes would not qualify as a Jencks Act "statement," when they "are not complete, are truncated in nature, or have become an unsiftable mix of witness testimony, investigators' selections, interpretations, and interpolations. The Congressional policy behind the Jencks Act was to protect witnesses from being impeached with words that are not their own, or are an incomplete version of the testimony." Finally, in *United States v. Griffin,* 659 F.2d 932, 937–38 (9th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2019, 72 L.Ed.2d 473 (1982), that Court was more positive:

> "On the other hand, the district court also must determine whether the rough notes should be considered as the agent's 'statement' for Jencks Act purposes should any of the officers become a government witness at trial. It is highly unlikely that the agents' rough notes could be considered Jencks Act statements. In the first place, with regard to that portion of an agent's notes which records his thoughts and observations independent of the interviewee's remarks, an agent's rough notes usually are considered too cryptic and incomplete to constitute the full statement envisioned by the Jencks Act."

The Court in that case concluded as follows (659 F.2d at 938, n. 4):

> "Thus, it will be the very unusual case where an agent's own thoughts will be recorded in rough interview notes with sufficient completeness or intent to communicate to be a Jencks Act statement. *In the more typical case, only the formal interview report, through which the agent intends to communicate to others, will be a 'statement' under the Jencks Act.*" (Emphasis added)

It is by no means clear from this review of the late Ninth Circuit decisions that such Circuit would find that the conviction herein had to be reversed because of the refusal of the District Judge to suppress the testimony of agent Sexton.

So far as the Third Circuit is concerned, its decision in *Vella* simply adopted the conclusions in *Harrison* without any statement of reasons. However, when it had the specific issue before it, it did not adopt the inflexible, mechanical rule enunciated in *Harrison.* Thus, in *United States v. Walden,* 578 F.2d 966 (3d Cir.1978), the agent had prepared from his notes a handwritten draft of his interview of the witness. That draft was submitted to his superior for approval. The superior made what were described as "certain editorial changes." It was then returned to the agent who checked and had it typed, after which he signed it. The question was whether the handwritten draft which the agent submitted to his superior was Jencks Act material. The District Judge held it was. On appeal, the Court of Appeals found that the handwritten draft "might be 'statements' under the Jencks Act." It based this statement on this reasoning: " . . . the report draft was at least in form sufficiently acceptable to the agent that he allowed it to be reviewed by his superior. Therefore, the draft might have been 'adopted or approved' by the agent." It accordingly remanded the case to the district court to determine whether the draft was Jencks Act material. Id. at 970.[18] While it may well be that the Third Circuit will follow *Harrison* in any case such as this, *Walden* suggests that this result is not automatic.

As we have said, one commentator has intimated that *United States v. Sanchez* has adopted the *Harrison* stance on the duty of

---

**18.** In remanding to the district court the determination of whether the draft was Jencks Act material in a case of ambiguity, the Court was apparently adopting the suggestion of Justice Frankfurter in *Palermo* (360 U.S. at 353, 79 S.Ct. at 1225):

> "Final decision as to production must rest, as it does so very often in procedural and evidentiary matters, within the good sense and experience of the district judge guided by the

standards we have outlined, and subject to the appropriately limited review of appellate courts."

On remand, the District Court found the material within the Act for the reasons suggested by the Court of Appeals but found the failure to produce was harmless. 465 F.Supp. 255, 261 (E.D.Pa.1978). This decision was affirmed for the reasons stated by the District Court in 590 F.2d 85 (3d Cir.1979).

a government agent to preserve and produce rough preliminary interview notes. An analysis of that decision will demonstrate quickly that such deduction is not supported by the language of the opinion. The notes involved there were those of a government-employed informer, Perdomo, in Colombia. Her notes were transmitted to her superiors. One of the superiors reviewed the notes and made his own formal report based on Perdomo's notes. After completing his own report, the superior destroyed Perdomo's notes. The Court held that, since the notes of Perdomo had been in turn incorporated in a final interview report by her superior who had not interviewed or observed personally any of the witnesses or defendants rather than by her (Perdomo), the original notes had to be produced. But the Court added a cautionary note in which it made plain that, had Perdomo herself made the formal report incorporating her rough notes, the formal report and not the rough notes would have been the only proper Jencks Act material.[19] Thus, it said in note 20 on page 66, 635 F.2d:

> "There is far less likelihood of a similar misinterpretation or inconsistency when the agent makes a formal report based on his own notes. Hence the government is not required to preserve those notes. *Killian v. United States,* 368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961); *United States v. Anzalone,* 555 F.2d 317, 321 (2d Cir.1977), *on rehearing on another issue,* 560 F.2d 492 (2d Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. Jones,* 360 F.2d 92 (2d Cir.1966), *cert. denied,* 385 U.S. 1012, 87 S.Ct. 721, 17 L.Ed.2d 549 (1967); *United States v. Co-*

*mulada,* 340 F.2d 449 (2d Cir.1965), *cert. denied,* 380 U.S. 978, 83 S.Ct. 1343, 14 L.Ed.2d 272 (1965)."

By citing the cases it did, the Court removed all doubt that it was in any way departing from or abandoning the long, consistent line of Second Circuit cases holding that rough interview notes of a government agent which had been incorporated in the agent's 302 report were not required under § 3500(e)(1) to be preserved or produced.[20]

We have reviewed at considerable length the authorities, pro and con, particularly those that are contrary to the majority rule on the point in issue because the point has recurring importance in the administration of criminal trials.[21] We find, as we have observed, that the history, legislative purpose and rationale of the Act as well as the majority of the pertinent decisions which have considered the point, including decisions of our own Circuit, supportive of the conclusion that the investigative notes of a government agent, made in the course of interviewing witnesses, which are later incorporated in the agent's formal 302 report, are not statements within the meaning of Section 3500(e)(1). The decisions to the contrary, in our opinion, make the very error of giving an overexpansive interpretation to the right given under the Act, which, as we have seen, was the primary purpose of Congress in enacting § 3500. We accordingly affirm the ruling of the district court in refusing to strike agent Sexton's rebuttal testimony.

Accordingly, the judgment of conviction is

AFFIRMED.

---

**19.** This distinction between a final interview report made by an agent from his own preliminary notes and one prepared by another from such notes was, also, noted by the Court in *United States v. Carrasco, supra,* 537 F.2d at 377. But, where the agent prepares his final report from his own preliminary notes, the Court in that case, as did *Sanchez,* said unqualifiedly:

> "Moreover, preliminary notes of an agent from which he later prepares a report are not

statements as that term is defined in the Jencks Act."

**20.** As Judge Wright demonstrated in *Harrison,* 524 F.2d at 430, n. 25, the Second Circuit has consistently followed, since 1960 in *United States v. Thomas,* 282 F.2d 191 (2d Cir.1960), the majority rule.

**21.** This list indicates that the Second, Fourth, Fifth, Sixth, Seventh, Eighth and Tenth Circuits have all followed the majority rule.