586 F.2d 1020
 UNITED STATES of America, Appellee,
v.
Alfred David CROWELL, Appellant.
UNITED STATES of America, Appellee,
v.
Donal Jarrett GILLESPIE, Appellant.
UNITED STATES of America, Appellee,
v.
Michael Marion ROBERTSON, Appellant (two cases).
 Nos. 76-2323, 76-2324, 76-2325 and 77-1504.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 11, 1978.
Decided Nov. 17, 1978.
 
 Lee Gordon, Baltimore, Md. (Karl H. Goodman, Gordon & Goodman, Baltimore, Md., on brief), for appellant in 76-2325 and 77-1504.
 David B. Lamb, Washington, D. C. (Patrick J. Moran, Lamb, Halleck & Keats, Washington, D. C., on brief), for appellant in 76-2323.
 Gary E. Klein (Kenneth E. Conklin, Rockville, Md., on brief), for appellant in 76-2324.
 Robert B. Schulman, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.
 Before HAYNSWORTH, Chief Judge, and WINTER and PHILLIPS, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Defendants, Alfred David Crowell, Donal Jarrett Gillespie and Michael Marion Robertson, were convicted by a jury of conspiracy to manufacture, distribute or dispense, or possess with intent to manufacture, distribute or dispense the controlled substance phencyclidine (PCP), in violation of 21 U.S.C §§ 846 and 841(a)(1). Crowell was also convicted of four separate charges of traveling in interstate commerce in aid of a racketeering enterprise in violation of 18 U.S.C. § 1952(a)(3).[1]
 
 
 2
 Each has appealed and collectively they assign ten errors committed during their trials and in rulings on pretrial motions which they assert require reversal of their convictions. All claim error in the district court's alleged failure to interrogate the non-sequestered jury about its exposure to prejudicial publicity. Crowell claims error in the district court's denial of his motion to suppress the fruits of the warrantless search of his trash can, the search of his truck as authorized by a warrant, and the search of his residence, again conducted under warrant. He also asserts that the district court improperly denied him standing to challenge the validity of the search of four separate premises and improperly denied him a hearing on his claim of illegal electronic surveillance, and that the district judge erroneously refused to disqualify himself upon Crowell's affidavit of bias and prejudice. Robertson asserts that the indictment against him should be dismissed in accordance with a government promise of immunity. Gillespie contends that the Jencks Act was violated when the statement of a witness was not furnished him because it had improperly been destroyed. He also contends that the testimony of a Drug Enforcement Agent should have been stricken because the agent failed to keep his notes concerning the matter about which he testified and that it was error for the district court to deny his pretrial motion for severance. Finally, he asserts that the evidence was legally insufficient to convict him.
 
 
 3
 We see no reversible error in the numerous contentions that are advanced and we affirm.
 
 I.
 
 4
 The government's evidence consisted chiefly of the observations of agents who had conducted surveillance of various defendants and the fruits of several searches of places where PCP was manufactured and stored. There was also testimony from persons who participated in the operation of the conspiracy.
 
 
 5
 In support of the conspiracy count of the indictment, the government's evidence showed the existence of a scheme to manufacture an enormously profitable controlled dangerous substance, phencyclidine (PCP). Initially the manufacturing operation was conducted at Crowell's home in Montgomery County, Maryland, where Crowell and Robertson spent hours refining the necessary chemical ingredients according to a process taught by records which they obtained from the United States Patent Office. As the enterprise flourished, Gillespie and others were added to the fold Gillespie to aid in distribution of the product and others to assist in its manufacture. Clandestine laboratories were established in two counties of Virginia and quantities of apparatus and chemicals were purchased in the District of Columbia, Maryland, Virginia, New York and Colorado, and transported to the laboratories.
 
 
 6
 Law enforcement officers first discovered the illegal enterprise in 1975 as a result of observations of Crowell's residence and detection of the chemical odors emanating therefrom. Materials were seized from Crowell's trash and analyzed. They were found to contain PCP. A search warrant for the premises was executed and various chemicals, apparatus and an enormous quantity of PCP were seized.
 
 
 7
 After the 1975 raid, the Crowell laboratory was moved to the home of a non-appealing co-defendant and plans were made to move it elsewhere. Gillespie and another purchased a farm in West Virginia as a site but that location was never used for manufacture. A second search warrant for Crowell's residence was executed in 1976 and chemicals, money and a small quantity of PCP were seized. The laboratory was then moved to Tappahannock, Virginia and the execution of a search warrant on it uncovered a cache of chemicals and apparatus capable of being used to manufacture PCP worth millions of dollars.
 
 
 8
 Other facts will be stated later in the opinion in connection with the contentions to which they relate.
 
 II.
 Voir Dire of Jury
 
 9
 The trial of defendants' case generated a great deal of newspaper publicity both before the trial began and during its course. In the selection of the jury, at least one member of the venire was excused because he said that he had read about the case that morning. Once the jury was selected, the district court admonished it to refrain from reading articles or listening to broadcasts concerning the trial. The jury was not sequestered, but this admonition was repeated periodically throughout the trial.
 
 
 10
 On the second day of trial, defense counsel presented to the court two newspaper articles that reported on the opening of the proceedings. Both stressed that courtroom security was unusually restrictive in response to unspecified threats. The articles named the defendants and identified the charges against them. Immediately after learning about the articles, the district judge inquired of the jurors whether they had been exposed to any publicity concerning the case. When there was no response, he repeated the admonition against reading articles or listening to broadcasts about the trial and proceeded with the case.
 
 
 11
 On the fourth day of trial, a newspaper published an edition bearing the banner headline, "DEATH THREAT TIP CAUSES FEDS TO TIGHTEN DRUG TRIAL SECURITY Gang May Attempt to Kill Defendant." The body of the article contained highly prejudicial information. Defense counsel called this article to the attention of the district court and moved for a mistrial. Again the district court interrogated the jury collectively as to whether anyone had read the article and when no juror responded affirmatively, the district court denied the motion and proceeded with the trial.
 
 
 12
 We see no error in the manner in which the district court proceeded or in its ruling. Our decisions in United States v. Pomponio, 517 F.2d 460 (4 Cir.), Cert. denied, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975); and United States v. Hankish, 502 F.2d 71 (4 Cir. 1974), prescribed the manner in which a district court should proceed to determine whether a jury's impartiality has been adversely affected by prejudicial publicity. First, the obligation of bringing prejudicial material to the attention of the district judge rests with defense counsel. Once the material is before the judge, he must determine whether it is prejudicial. That entails a determination of whether the publicity disclosed information about the defendant that would not be admissible before the jury, or that was not in fact adduced before the jury in open court. United States v. Jones, 542 F.2d 186, 195 (4 Cir. 1976). If the material is found to have been prejudicial, the judge must then ascertain whether any of the jurors were exposed to it. "(I)f no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further." United States v. Hankish, 502 F.2d 71, at 77. (Quoting from Margoles v. United States, 407 F.2d 727, 735 (7 Cir.), Cert. denied,396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969)). If, on the other hand, some members have been exposed to the prejudicial material, the district court must then determine the extent and effect of the infection and act to ensure a fair trial. United States v. Hankish, supra; United States v. Pomponio,517 F.2d at 463.
 
 
 13
 In the instant case, it is manifest that the district court proceeded correctly. Since upon collective inquiry no juror indicated that he had read the publicity in question, there was no need for voir dire on an individual basis.
 
 III.
 Search of Trash
 
 14
 On two occasions in late March or early April, 1975, Montgomery County police officers, lacking a warrant, nonetheless directed Crowell's private contract trash collector to turn over trash which had been collected from Crowell's residence. On each occasion the trash collector had collected the bag of trash and carried it off of the Crowell property preparatory to putting it on the collection truck. On each occasion the trash collector did as he was told and the police officers received the bag. The trash collector had no permission from Crowell to turn over the trash to the police. At the same time, there was no evidence that he had any instructions other than to remove and dispose of it.
 
 
 15
 The police examined the trash and caused certain substances contained in it to be subjected to chemical analysis. They were shown to be PCP. The presence of PCP in the trash was later used by the police as one of the grounds for obtaining a search warrant to search Crowell's home. It is not shown that evidence of the presence of PCP in the trash was used to convict Crowell and his co-defendants; but even if we assume that they may attack the validity of the warrant because the affidavit supporting its issuance contained an allegation of fact allegedly obtained in violation of the fourth amendment, we see no merit in the contention that the fourth amendment was transgressed.
 
 
 16
 The validity of garbage searches has been the subject of numerous opinions by various courts. While most people probably expect that their garbage will not be inspected but rather will be taken directly to the dump, it is equally true that most people have no clear understanding of what happens to their garbage when it is removed from their premises and have even less expectation of having anything further to do with it once it is removed. The real question is whether there is a reasonable expectation of privacy that one's garbage will not be searched.
 
 
 17
 On this issue, the authorities are split. Stemming from People v. Edwards, 71 Cal.2d 1096, 80 Cal.Rptr. 633, 458 P.2d 712 (1969), a number of state courts and a federal district court[2] have held that a person discarding trash has a reasonable expectation that his trash will not be rummaged through and picked over by police without a search warrant, and therefore that a warrantless search of one's trash is in violation of the fourth amendment. But we think that the better view is that expressed by every United States Court of Appeals that has had reason to address the issue as exemplified in United States v. Shelby, 573 F.2d 971 (7 Cir. 1978); Magda v. Benson, 536 F.2d 111 (6 Cir. 1972); and United States v. Mustone, 469 F.2d 970 (1 Cir. 1972). See also United States v. Minker, 312 F.2d 632 (3 Cir. 1962), Cert. denied, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963); United States v. Dzialak, 441 F.2d 212 (2 Cir.), Cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971). In accord with those cases, our view is that, absent proof that a person has made some special arrangement for the disposition of his garbage inviolate, he has no reasonable expectation of privacy with respect to it once he has placed it for collection. The act of placing it for collection is an act of abandonment and what happens to it thereafter is not within the protection of the fourth amendment. Certainly there was no fourth amendment protection in the instant case where there was no evidence that Crowell had made any special arrangement for the disposition of his trash and where the garbage had been actually removed from Crowell's premises before it was commandeered by the police.
 
 IV.
 Crowell's Other Search Contentions
 
 18
 We think that the Maryland warrant for the search of Crowell's U-haul truck on January 16, 1976 was valid because the affidavit on which it was issued established probable cause to believe that a crime had been committed under Maryland law. In the course of this search, it was proper to seize non-controlled chemicals which could be used for the manufacture of PCP. Similarly, we think that the affidavit for the search of his residence on April 3, 1975 established probable cause justifying the issuance of a warrant. The affidavit was not rendered deficient by proof that the affidavit erroneously stated that PCP found in the trash was in the form of white crystalline material rather than, as was the fact, in the form of brown flakes. The variance appears innocent and a result of simple carelessness; it does not demonstrate perjury on the part of the affiant or reckless disregard of the true facts. Franks v. Delaware, --- U.S. ----, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); United States v. Lee, 540 F.2d 1205, 1209 (4 Cir.), Cert. denied, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976). Thus, we reject the attacks on the validity of both warrants.
 
 
 19
 Crowell's attacks on the validity of four searches, i. e. search of a residence in Spotsylvania County, Virginia in April 1975, search of a farmhouse in Greenbrier, West Virginia on October 22, 1975, search of the residence of Milton Warren in Wheaton, Maryland in December 1975, and search of an outbuilding in Essex County, Virginia on April 1, 1976, were rejected by the district court on the ground that Crowell lacked standing to contest their validity. We think that the district court ruled correctly.
 
 
 20
 Before us, Crowell contends that he had standing both because he had a possessory interest in the items seized, and because he had a possessory interest in the premises searched. Were Crowell charged with a crime an essential element of which is possession of the items seized, he would have standing to contest the validity of the searches. Brown v. United States, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). But Crowell was not charged with such a crime; he was charged with (a) conspiracy which is not a possessory crime, even where the conspiracy is one to manufacture and possess a controlled substance, United States v. Hutchinson, 488 F.2d 484, 492 (8 Cir. 1973), Cert. denied, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974), and (b) traveling in interstate commerce in aid of a racketeering enterprise which again involves no element of possession. Absent accusation of a crime an essential element of which is possession of the items seized as a result of a search, we have held that an allegation of a possessory interest in the items seized, standing alone, does not confer standing to object to a search. United States v. Jackson, 585 F.2d 653 (Nos. 77-2530/31, 1978).
 
 
 21
 Crowell's assertion of a possessory interest in the premises searched, if sustained by the proof, would confer standing on him. Brown v. United States, supra. His motion to suppress, however, alleged no direct proprietary or possessory interest in any of the four premises; the proof showed that they were owned or rented by others; and he was not present on any of the four premises when the searches were conducted. Crowell's assertion of a possessory or proprietary interest in the premises searched depends upon his claim that the other evidence showed that he was the kingpin in the overall conspiracy and, since the various premises were rented or used to further the conspiracy, under the law of agency, the acts of Crowell's co-conspirators in acquiring leases and proprietary interests became his acts so as to give him standing.
 
 
 22
 In United States v. Hunt, 505 F.2d 931 (5 Cir. 1974), Cert. denied, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975), the identical argument was rejected, and we are persuaded of the correctness of that decision. In Hunt, Judge Goldberg made a thorough and scholarly analysis of recent Supreme Court decisions relating to standing to assert a violation of the fourth amendment, concluding that the key to standing is whether the person asserting it was a "victim" of the search, "the 'one against whom the search or seizure was directed.' " 505 F.2d at 938. He stressed the correlation between the scope of the amendment's protection and the concept of privacy. Then he added:
 
 
 23
 One of the most significant aspects of the law of standing in search and seizure cases, and one that clearly reflects the intensely personal nature of Fourth Amendment rights, is the rule that interpersonal relationships cannot make a "victim" of one who is not otherwise "one against whom the search or seizure is directed." . . . Alderman v. United States (394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)) dictates that co-defendants and co-conspirators may not assert the Fourth Amendment rights of their alleged partners in crime solely on the basis of their interpersonal association, because Fourth Amendment rights are personal ones. 505 F.2d at 939.
 
 
 24
 More specifically, Judge Goldberg rejected the argument that defendants had standing to object to a search because the parties searched were their agents:
 
 
 25
 Fifteen years of Supreme Court decisions stand squarely in the way of defendants' attempt to create a rule of Per se standing for parties in a principal-agent relationship. This claim of privacy by agency is just the sort of vicarious assertion of Fourth Amendment rights that Alderman (Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)) and Brown (Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973)) forbid. If we were to adopt the position urged by defendants, any criminally-inclined individual could earn a double dividend by hiring private investigators to complete his schemes: not only could the principal disassociate himself from any physical unpleasantness or risk involved in the criminal activity and at the same time cover his own tracks, but he could claim a privacy interest in any instrumentalities of the crime, no matter whether he had the slightest idea of the existence of such instrumentalities before the unpleasant epiphany of arrest. 505 F.2d at 942.
 
 
 26
 To like effect is United States v. Potter, 419 F.Supp. 1151, 1154-56 (N.D.Ill., 1976), Aff'd, 567 F.2d 392 (7 Cir. 1977).
 
 
 27
 Thus we conclude that, without proof that Crowell selected the various premises and directed that they be acquired by purchase or lease in his name or in the name of a nominee, he did not acquire a sufficient right of privacy therein to give him standing to object to their search.[3]
 
 V.
 
 28
 Denial of Hearing on Electronic Surveillance; The District
 
 Judge's Refusal to Disqualify Himself
 
 29
 Crowell contends that he was improperly denied a hearing under 18 U.S.C. § 3504(a)(1) with respect to his claim that some of the government's evidence was derived from the use of illegal electronic surveillance. We think that no hearing was required.
 
 
 30
 In fact, a bumper beeper was installed on Crowell's airplane pursuant to a court order and another was installed without a court order on a car belonging to a co-defendant's wife. The function of the bumper beepers was to serve as a beacon device which would permit detection of the location of the vehicles to which they were attached. But as an Assistant United States Attorney reported to the district court, the bumper beeper attached to the automobile failed to function and that attached to the airplane was discovered by Crowell and rendered inoperative so that it, too, failed to function. As a result, there was no effective surveillance of either vehicle and no logs of where they had traveled.
 
 
 31
 While it is true that § 3504(a)(1) provides that, upon the claim of one who is aggrieved by admission of evidence obtained by an unlawful act, his opponent "shall affirm or deny the occurrence of the alleged unlawful act," we think that the burden was met by the representations of the government's counsel.
 
 
 32
 The claim that the district judge improperly refused to recuse himself, in accordance with 28 U.S.C. § 144, is frivolous. Crowell's affidavit of bias and prejudice alleged that (a) in ruling on certain pretrial motions, the district judge ruled, referring to typewritten pages before him without taking a recess, indicating that he prejudged the case, and (b) on one occasion the district judge said that he would deny certain motions but would give Crowell a hearing anyway.
 
 
 33
 These allegations do not establish bias or prejudice stemming "from an extrajudicial source and result(ing) in an opinion on the merits on some basis other than what the judge learned from his participation in the case. . . ." United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). The motions presented legal issues largely determinable from papers before the district judge. The fact that the district judge had researched the problems in advance and was able to make an immediate ruling does not establish prejudgment.
 
 VI.
 Robertson's Claim of Immunity
 
 34
 During the course of the investigation of the case before an indictment was returned, the government agreed with Robertson, who was represented by counsel, that in return for his "complete and total cooperation" with the law enforcement personnel investigating the case, he would not be prosecuted for any information that he supplied. Following the agreement, Robertson submitted to one interview at the United States Attorney's office during which he denied any participation in the conspiracy or any knowledge of Crowell's involvement in the manufacture of PCP. When Robertson failed to appear at a second scheduled interview and declined to appear at a third or any future scheduled interview, the government gave Robertson's attorney written notice that it was withdrawing its agreement for failure on the part of Robertson to cooperate.
 
 
 35
 In due course, Robertson was indicted and he moved to dismiss the indictment on the ground that it violated the agreement. The district court ruled that Robertson had failed to perform the condition precedent to the promised grant of immunity by his failure to cooperate. The record clearly reflects that Robertson did not tell what he knew. Denial of the motion was therefore proper. United States v. Simmons, 537 F.2d 1260 (4 Cir. 1976).
 
 VII.
 
 36
 Gillespie's Claim of Violation of the Jencks Act
 
 
 37
 Catherine Foster testified as a government witness and part of her testimony implicated Gillespie. Prior to trial, the government had voluntarily disclosed copies of all statements made by government witnesses and copies of all reports of interviews of government witnesses, including copies of an unsigned pretrial statement by Catherine Foster.
 
 
 38
 During the course of cross-examination, Foster revealed that she had examined the notes prepared by Drug Enforcement Agent Grimes before they were typed in final form and had said that they were correct, but she had not read beyond the first two paragraphs of the document which the government had furnished to Gillespie's counsel. Gillespie's counsel immediately moved for production of the agent's notes. The motion was denied, and it was later shown that the notes could not have been produced since they had been destroyed.
 
 
 39
 The government concedes that the interview notes were Jencks material and that their destruction was error. It insists, however, that the error was harmless, and we agree.
 
 
 40
 A violation of the Jencks Act should be excused only where it it perfectly clear that the defense was not prejudiced. United States v. Snow,537 F.2d 1166, 1168 (4 Cir. 1976). We think the lack of prejudice was established. Foster was a cumulative witness whose testimony against Gillespie was fully corroborated. While this alone does not demonstrate lack of prejudice, the record also indicates that the statement furnished counsel substantially incorporated the interview notes. Indeed, defense counsel did not ask Foster if the statement that was furnished was inaccurate with regard to the information she gave the agent. Nor did defense counsel interrogate Grimes about the accuracy of the statement he prepared. By receiving a copy of the statement, counsel obtained in substance all that the notes would have disclosed.
 
 
 41
 More significantly, however, Foster's credibility was thoroughly impeached so that any additional attack would have been to little purpose. Foster admitted that she regularly used PCP; she also stated that she sometimes had trouble remembering things; and both parties are agreed that her testimony was confused, inconsistent and strained.
 
 VIII.
 
 42
 Gillespie's Contentions Regarding the Drug Enforcement
 
 Agent's Testimony
 
 43
 On October 14 and November 21, 1975, Drug Enforcement Agent Grimes eavesdropped from an adjoining motel room on three conversations participated in by Gillespie. Grimes took notes of what he heard, but intervening noise frequently interfered with his efforts. He incorporated the contents of these notes, except with regard to personal matters discussed by those engaging in the conversation which Grimes thought irrelevant to the investigation, into his report. After the report was prepared, the original notes were destroyed.
 
 
 44
 The agent's report was furnished to defense counsel before trial, but after Grimes had testified about the conversations he overheard and it was learned that his original notes had been destroyed, Gillespie's counsel moved to strike the agent's testimony on the ground that the government had violated F.R.Crim.P. 16(a) and the holding of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not furnishing or producing the original notes.
 
 
 45
 We see no error in the district court's refusal to strike Grimes' testimony. The requirement of Rule 16 is that the government produce for discovery any "relevant" written or recorded statements, etc. Grimes testified that his report incorporated the entire contents of his notes except for those portions which did not relate to the investigation. That being so, the report furnished counsel supplied all Relevant statements in the possession of the government.
 
 
 46
 Similarly, the destruction of the notes did not amount to a violation of the Brady doctrine. Brady held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. The circuits are split on whether an agent's rough notes constitute Brady material where their only exculpatory value lies in their use to impeach the agent's testimony. Compare United States v. Harrison, 173 U.S.App.D.C. 260, 524 F.2d 421 (1975) (notes held producible), With United States v. Martin, 565 F.2d 362 (5 Cir. 1978) (notes not Brady material).
 
 
 47
 We hold that Brady does not apply in such cases in the absence of some demonstration that the material sought would be exculpatory, even if that burden is relaxed because the document has been destroyed. If there were any real issue as to Grimes' credibility, presumably Gillespie, who was a party to the conversations that were overheard and who had ample time to examine the report with his counsel, would have known whether the agent's report was accurate and hence the defense would have had the ability to determine the impeachment potential of the notes. Here, all that we have is the unsupported speculation that there May have been some variance between the notes and the report into which they were incorporated. We do not think that this is enough to establish a violation of Brady.
 
 IX.
 Gillespie's Other Contentions
 
 48
 Gillespie's arguments that the district court should have granted a severance and that there was not legally sufficient evidence to sustain a verdict against him have been considered by us and we find them lacking in merit. We do not think that they warrant further discussion.
 
 
 49
 AFFIRMED.
 
 
 
 [1]
 The conspiracy count of the indictment was also returned against six other co-conspirators and named nineteen other unindicted co-conspirators as well as "others known and unknown to the Grand Jury. . . . " In three of the four travel counts, other co-defendants were indicted with Crowell
 
 
 [2]
 See, e. g., People v. Krivda, 5 Cal.3d 357, 96 Cal.Rptr. 62, 486 P.2d 1262 (1971), Vacated, 409 U.S. 33, 93 S.Ct. 32, 34 L.Ed.2d 45 (1972), Reaffirmed, 8 Cal.3d 623, 105 Cal.Rptr. 521, 504 P.2d 457 (1973); Ball v. State, 57 Wis.2d 653, 205 N.W.2d 353 (1973); State v. Chapman, 250 A.2d 203 (Me.1969); United States v. Kahan, 350 F.Supp. 784 (S.D.N.Y.1972), Aff'd in part and rev'd in part, 479 F.2d 290 (2 Cir. 1973), Rev'd 415 U.S. 239, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974)
 
 
 [3]
 We do not foreclose the possibility that one may acquire a right of privacy in premises through the acts of his agent. What we decide here is that the proof was insufficient to conclude that the right of privacy, and hence standing to complain of an allegedly illegal search, was created