John S. PLEASANT, et al., Plaintiffs,

v.

Larry LOVELL, Larry Hyatt, Vernon Pixley, Kenneth Batson, and Tim Fortune, Defendants.

Civ. A. No. 83 F 2251.

United States District Court, D. Colorado.

Feb. 12, 1987.

John S. Pleasant, Englewood, Colo., pro se.

William A. Cohan, Carl E. Stahl, Denver, Colo., for plaintiffs.

Robert N. Miller, U.S. Atty., Dahil D. Goss, Asst. U.S. Atty., Denver, Colo., Angelo I. Castelli, James M. McCarten, Trial Attys., Tax Div., Office of Special Litigation, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

This case involves the question of liability of several agents of the Internal Revenue Service Criminal Investigative Division ("IRS/CID"), who allegedly violated the constitutional rights and privileges of plaintiffs. Plaintiffs in this action were members of the National Commodity and Barter Association ("NCBA") during 1979 and 1980. Defendants are five Agents of the CID.

The parties have filed cross motions for summary judgment. Each party contends, and cross motions for summary judgment authorize the Court to assume, that no genuine issues of material fact exist. Thus, we treat the parties' motions, briefs, and exhibits, along with other pleadings and written submissions, as the body of evidence which would have been brought before the Court at a trial on the merits. The case has been bifurcated as to liability and damages. Accordingly, this Opinion only discusses issues of liability.

Jurisdiction is properly grounded on 28 U.S.C. §§ 1331 and 1343, U.S. Const. amends. I and IV, and the rationale of *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

For the reasons set forth below, defendants' Motion to Dismiss or for Summary Judgment is GRANTED. Plaintiffs' Cross Motion for Partial Summary Judgment is DENIED.

### I.

By way of background, it appears that the late John Grandbouche organized the NCBA sometime prior to July 1979. The NCBA may be loosely referred to as an association of individuals who believe that tax laws are violative of the United States Constitution.

During late August and early September of 1979, plaintiff John Pleasant became acquainted with Ms. Pauline Adams, who was then employed in the office of the United States Bankruptcy Trustee in Denver, Colorado. On September 9, 1986, Mr. Pleasant elicited Ms. Adams' assistance in obtaining some sample bankruptcy pleadings. Mr. Pleasant described his activities at the NCBA to Ms. Adams, and discussed the goals of the NCBA with her. Ms. Adams expressed an interest in learning more about the organization, and subsequently was introduced to John Grandbouche.

On September 19, 1979, either Mr. Grandbouche or Mr. Pleasant asked Ms. Adams to assist the NCBA in preparing some pleadings to be filed in court the next day. Ms. Adams was directed to go to Mr. Grandbouche's home that evening where she was provided a typewriter and a place to work. During the course of the evening, Ms. Adams overheard discussions about the means employed by the NCBA to effectuate their goals of tax protestation. The nature of the conversations were of considerable concern to Ms. Adams.

On September 20, 1979, unsolicited by any government agent, Ms. Adams contacted the IRS to report the discussions which she overheard the night before. Special Agent Larry Lovell of the CID answered Ms. Adams' call. Defendant Lovell met with Ms. Adams that day. Later that evening, defendant Lovell and another IRS/CID agent met with Ms. Adams at her residence.

On October 3, 1979, defendant Lovell spoke with IRS Inspector Steve Simer concerning information that Ms. Adams had provided. Defendant Lovell told Inspector Simer that Ms. Adams had overheard conversations by Mr. Grandbouche and others concerning a tire shooting incident involving an IRS officer's car. On October 4, Inspector Simer asked defendant Lovell to identify the confidential informant for his

use as a source of information. Defendant Lovell explained that the source had requested to remain anonymous. On October 5, Defendant Lovell informed defendants Vernon Pixley, Group Manager of the Denver Office of the CID and Larry Hyatt, Chief of the Denver Office of the CID, about Inspector Simer's request to meet Ms. Adams, and of Ms. Adams request to keep her identity confidential. Defendant Hyatt instructed defendant Lovell to prepare a request to "number" Ms. Adams as a "restricted source confidential informant". Within a week, the request was approved by the District director, and Ms. Adams' identifying data was sealed and placed in a safe.

On October 5, 1979, Ms. Adams telephoned defendant Lovell at his residence to discuss the possibility of working on a full-time basis for the NCBA. One of the leaders of the NCBA had told Ms. Adams that she would be paid $1,500 per month for her efforts. In a Memorandum to the file dated October 5, defendant Lovell stated:

> I explained to CI [Confidential Informant, i.e. Ms. Adams] that a position with (deleted) and the organization would allow CI to gather and receive valuable information about the protest movement. I also stressed the CI's safety, and explained that a decision to take the position with (deleted) should be made entirely by the CI and with the CI's safety and financial situation in mind. I also told CI that if the position is accepted, caution should be exercised to prevent entrapment by the CI or illegal acts by the CI.

Ms. Adams accepted the position with NCBA.

Throughout the Fall of 1979, Ms. Adams gathered information from members of the NCBA and relayed that information to agents of the IRS. On October 23, 1979, Ms. Adams met with defendants Hyatt, Pixley, and defendant Lovell, as well as Special Agent Thomas P. McAndrews, who is not a defendant in this case. At the meeting, Ms. Adams gave the agents "materials which included numerous letters and correspondence to JOHN GRANDBOUCHE or NATIONAL BARTER AND EXCHANGE and what appeared to be a textbook or instructional material of some kind" (Memorandum to File dated October 23, 1979). Agent McAndrews copied the documents, returned the originals to defendant Lovell, who then gave them back to Ms. Adams.

At the October 23 meeting, Ms. Adams described statements she claimed to have overheard at NCBA, which defendants characterize as threats to the lives of a federal judge and IRS personnel. Ms. Adams' statements were corroborated by the report of Special Agent Larry Thompson, who had attended a public meeting on October 20, 1979 at which NCBA personnel made similarly threatening statements. Based on this evidence, defendant Hyatt sought and received emergency authorization to conduct electronic surveillance of the NCBA by consensual monitoring. Ms. Adams carried a concealed microphone/transmitter into the NCBA offices on October 25, 29 and 30, 1979. Conversations transmissible by the microphone secreted on her person were broadcast to the defendants, who monitored and tape-recorded those conversations. On October 30, 1979, the consensual monitoring was abandoned because no evidence of any murder plot or other crime had surfaced. However, nineteen persons associated with NCBA were identified. In a related case, the issue of whether the consensual monitoring activities violated constitutional rights was decided negatively by Judge Jim Carrigan of this federal court. *Grandbouche v. Adams*, 529 F.Supp. 545, 547–48 (D.Colo.1982). Judge Carrigan's opinion was adopted by this Court in our Order dated June 22, 1984.

On October 26, 1979, Ms. Adams informed defendant Lovell that she had been approached by an individual named Robert Bennett, who asked her to purchase guns for him. Ms. Adams previously had told Mr. Bennett that she could purchase weapons for him. When actually confronted with the issue, Ms. Adams told defendant Lovell that she could not purchase guns

because she was a convicted felon. On October 30, 1979, defendant Lovell conveyed that fact to defendant Pixley. On October 31, 1979, a background check was done on Ms. Adams. The background check confirmed that Ms. Adams had been convicted of a felony, and that she had received probation with a community service requirement. The check also revealed that Ms. Adams had previously provided information to the Colorado Bureau of Investigation, which led to the conviction of several drug traffickers.

On November 1, 1979, defendants Lovell and Pixley were informed by Ms. Adams that Mr. Grandbouche had asked her to take the Grandbouche/NCBA office trash to her home to burn it. Ms. Adams asked defendants Lovell and Pixley if they would like to examine the trash before she burned it. The assistance offered by Ms. Adams was purely voluntarily; it did not result from a request or enticement by the government agents. Defendants Lovell and Pixley accepted her offer and admonished her only to bring them the trash that Mr. Grandbouche had thrown out. From November 1, 1979 through December 17, 1979, either defendant Pixley or Lovell met with Ms. Adams periodically to pick up the Grandbouche/NCBA office trash.

On three occasions, November 13, 15, and 19, Ms. Adams provided defendants with items not contained in the trash. These three items consisted of a clearly labeled "Mailing List" which identified plaintiffs and their associates in the NCBA, a copy of a tape recording which Mr. Grandbouche sealed and asked Ms. Adams to mail, and 183 affidavits from members designating support for the political objectives of the NCBA. Items contained in the trash included documents and things which identified associational bank accounts and financial institutions used by the NCBA, its members and supporters.

During November 1979, defendant Lovell requested that a federal grand jury be impaneled to investigate Mr. Grandbouche and other individuals. With the approval of defendants Pixley and Hyatt, his request was referred to the United States Department of Justice. The grand jury was impaneled in the Spring of 1980. During the course of the investigation, the lead United States Attorney decided to issue a grand jury subpoena for the records of bank accounts that related to Mr. Grandbouche. Among the accounts identified was an account under the name of the NCBA at the First National Bank of Englewood ("Bank") which had a large and active transaction history. The number for this account had been identified by defendants Lovell and Pixley by examining the Grandbouche/NCBA office trash.

Defendant Kenneth Batson, a Special Agent with the CID who had been assigned to the grand jury investigation, served a subpoena on the Bank. While serving the subpoena, defendant Batson conversed with Bank employee Dennis Graham about customer notice requirements with respect to a federal grand jury subpoena. Defendant Batson told Mr. Graham that he could not order the Bank to refrain from notifying its customers, but that the grand jury investigation would be easier if notification was withheld. The Bank complied with the grand jury subpoena on August 4, 1980, without giving notice to the involved depositors.

Ms. Adams ceased her employment with NCBA on December 27, 1979. Contemporaneously, Ms. Adams publicly alleged that she had been assisting the IRS by providing them information while employed in the offices of a tax protest group. She further stated publicly that when she feared that her life was in danger the IRS refused to provide protection. Because of these disclosures, and for other reasons, defendants Lovell and Hyatt decided to terminate the IRS/CID association with Ms. Adams. Defendant Lovell then placed the classification "not fully reliable" into the background report on Ms. Adams.

On January 2, 1980, defendants Pixley and Lovell, and IRS secretary Betty Savage met with Ms. Adams in the offices of CID. At the meeting, Ms. Adams gave a sworn statement concerning the informa-

tion she had provided during her association with the NCBA. On February 6, 1980, Ms. Adams met with defendants Lovell and Batson, reviewed the sworn statement she had given, and reaffirmed the truth of her assertions.

## II.

Plaintiffs initiated this litigation on November 23, 1983. Originally, 408 plaintiffs and twenty defendants were named as parties in the case. Parties have been dismissed during the course of the litigation for such reasons as the lack of association of some plaintiffs with the NCBA during the relevant time frame, and the lack of personal involvement of certain defendants in the events which precipitated the litigation.

The remaining plaintiffs and defendants, in their respective motions for summary judgment, agree that there are no genuine issues of material fact concerning liability. Cross motions for summary judgment authorize the Court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties. *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir.1981). Accordingly, liability issues are ripe for summary disposition.

Plaintiffs contend that Ms. Adams acted as the agent of the IRS/CID. To the extent that Ms. Adams did act as an agent of the IRS/CID, plaintiffs contend that any of her actions which violated plaintiffs constitutional rights should be imputed to the federal defendants with whom she associated. Plaintiffs argue that the removal of documents and other items from NCBA offices by Ms. Adams constituted illegal searches and seizures, in violation of the fourth amendment to the United States Constitution. Plaintiffs further argue that the seizure of NCBA membership lists and political affidavits abridged plaintiffs first amendment rights to free speech and association.

Additionally, plaintiffs contend that the production of bank documents without notice to NCBA depositors, done at the request of the defendants pursuant to a grand jury subpoena, violated plaintiffs first and fourth amendment rights. All of the actions complained of, plaintiffs submit, chilled their constitutional rights to free speech and free association. Moreover, because the federal defendants acted in concert, plaintiffs contend that defendants engaged in a conspiracy to violate plaintiffs' first and fourth amendment rights secured by the United States Constitution.

Defendants claim that they are entitled to either absolute or qualified immunity from liability for their actions. They argue that, regardless of their immunity, Ms. Adams acted independently and was never the agent of the IRS/CID. Further, defendants submit that plaintiffs had no expectation of privacy in items contained in office trash, and thus no fourth amendment rights were violated. Similarly, defendants contend that the only materials provided by Ms. Adams which were used in any investigation were the financial records contained in the trash. They argue that, because the financial records were only used to subpoena the Bank's records and because plaintiffs have no privacy rights in bank records, plaintiffs' rights to free association and free speech were neither abridged nor chilled.

In order to prove defendants' liability, plaintiffs must first establish that Ms. Adams was an agent of the government. We find that she was not an agent, as that term is defined by common law. Further, we find that even if Ms. Adams could be construed to be an agent of the government, the defendants are entitled to qualified immunity and thus, as a matter of law, cannot be held liable.

## III.

■ Initially, we find that we need not reach the issue of qualified immunity with respect to defendants Timothy Fortune and Kenneth Batson. Defendants Fortune and Batson have not engaged in any actionable conduct. Defendant Timothy Fortune had limited involvement in the events which

precipitated this litigation. Agent Fortune is a technical operator involved in the application and use of electronic investigation equipment. He was assigned the duty of assisting in the electronic monitoring and recording of conversations among John Grandbouche and others, through the use of a transmitter secreted on the body of Ms. Adams. His assignment spanned from October 24, 1979 to October 30, 1979. He had no further involvement in the investigation of NCBA or Mr. Grandbouche.

As stated in Section I of this Opinion, the consensual monitoring of Mr. Grandbouche and NCBA in which Agent Fortune was involved did not violate any constitutional rights of the plaintiffs. On June 22, 1984, we adopted the rationale of the opinion expressed by Judge Jim Carrigan in *Grandbouche v. Adams*, 529 F.Supp. 545 (D.Colo.1982), covering the legality of the government's consensual monitoring activities. We reaffirm our previous ruling. Agent Fortune acted in a constitutionally permissible manner.

■ Defendant Kenneth Batson served a grand jury subpoena on Dennis Graham, head cashier of the First National Bank of Englewood, directing the production of financial information pertaining to NCBA. The Bank produced the information without notifying its clients. However, Agent Batson explained to Mr. Graham that it would be easier to conduct the investigation without placing potential grand jury witnesses on notice of the investigation. He further explained to Mr. Graham that there was no notification requirement related to federal grand jury subpoenas.

Agent Batson's statement regarding notification requirements was correct. Although the Financial Privacy Act of 1978, 12 U.S.C. § 3401 et seq., places certain notification requirements on judicial subpoenas relating to financial information, Congress intended:

> to allow the financial institution complete discretion in its dealings with the customer relative to the existence of a grand jury investigation.

*In re Castiglione*, 587 F.Supp. 1210, 1214 (E.D.Cal.1984) (notice to customer neither required nor prohibited).

Agent Batson had no further involvement in the investigation. Because the production of financial information without notice to the customer, pursuant to a grand jury subpoena, is permissible, the service of a subpoena requiring such production does not violate the statutory or constitutional rights of the customer. Agent Batson's role in the investigation was, therefore, constitutional.

Accordingly, based on the facts before the Court, summary judgment in favor of defendants Fortune and Batson is granted.

## IV.

### A.

The fact that Ms. Adams was a "restricted source confidential informant" for the IRS/CID does not necessarily establish that Ms. Adams acted as an agent of the government. Considering all the facts and circumstances, we conclude that Ms. Adams did not act as the agent of the IRS/CID.

The fourth amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures". U.S. Const. amend. IV. Significantly, the protection extends only to government action; it does not proscribe "a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official". *Walter v. United States*, 447 U.S. 649, 662, 100 S.Ct. 2395, 2404, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting). *See also United States v. Jacobsen*, 466 U.S. 109, 113–14, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *Walter v. United States*, 447 U.S. 649, 656 (1980) (opinion of Stevens, J.); *Id.*, at 660–61 (White, J., concurring in part and concurring in judgment); *United States v. Janis*, 428 U.S. 433, 455–56, n. 31, 96 S.Ct. 3021, 3032–33, n. 31, 49 L.Ed.2d 1046 (1976);

*Coolidge v. New Hampshire*, 403 U.S. 443, 487–90, 91 S.Ct. 2022, 2048–50, 29 L.Ed.2d 564 (1971); *Burdeau v. McDowell*, 256 U.S. 465, 475, (1921).

■ Because Ms. Adams was neither paid by the government nor was providing information pursuant to a written or verbal agreement, Ms. Adams clearly acted as a private individual. Determination of whether Ms. Adams effected her searches "with the participation or knowledge of any government official", however, is a more difficult issue.

Courts have devised differing standards to adjudge the degree of "participation or knowledge" necessary to impute to government officials the infringing acts of private individuals. The Sixth Circuit has held, for example, that the government "must have instigated, encouraged or participated in the search". *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir.1985); *United States v. Coleman*, 628 F.2d 961, 965 (6th Cir.1980). The Ninth and Tenth Circuits require a showing of "encouragement or acquiescence" by the government officers. *United States v. Lamport*, 787 F.2d 474, 476 (10th Cir.1986); *United States v. Snowadzki*, 723 F.2d 1427, 1429 (9th Cir.1984).

■ The burden of establishing government involvement in a private search rests on the party objecting to the propriety of the search. *United States v. Snowadzki*, 723 F.2d 1427, 1429 (9th Cir.1984). The court must consider the evidence "in light of all the circumstances of the case". *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971).

■ The circumstances of this case persuade us that defendants' actions did not constitute acquiescence to or encouragement of Ms. Adams' private search and other activities. Ms. Adams was not solicited, enlisted, or paid by the government. Further, she did not receive any kind of benefit from government agents in exchange for her investigative work. She gratuitously volunteered information and documents communicated to defendants.

Mere acceptance of information from a private informant, without any evidence of coercion, enticement, solicitation, or benefit, does not constitute encouragement or acquiescence of an impermissible nature.

In *Snowadzki, supra.*, the Ninth Circuit upheld the trial court's determination that an IRS agent "had nothing to do with where the records were going to be obtained, [or] how they would be obtained. He simply responded in answer to a question that the records would be of some help in evaluating the informer's claim." *United States v. Snowadzki*, 723 F.2d 1427, 1429–30 (9th Cir.1984) (conviction of filing false tax returns based partly on documents obtained through private search). The circumstances of this case present a situation similar to *Snowadzki*; because we find that defendants did not evidence the requisite level of "encouragement or acquiescence", no agency relationship existed between Ms. Adams and the IRS/CID.

### B.

Plaintiffs cite portions of transcripts of recorded meetings between Ms. Adams and defendants that allegedly support the charges that defendants acquiesced to or encouraged Ms. Adams' private searches.

■ For instance, in a tape recorded conversation on October 25, 1979, Mr. Grandbouche discussed the noted political affidavits with Ms. Adams, and told her:

> GRANDBOUCHE: Now this one here is a fellow by the name of Bascom. Now the way these affidavits work, they mail 'em to us—and I'm not gonna take this with me—I don't want these ever to leave this office.
>
> ADAMS: Uh-huh.

By inference, Mr. Grandbouche's statement evidences some kind of an expectation of privacy in the political affidavits. Because of the microphone/transmitter concealed on Ms. Adams, Mr. Grandbouche's statement was heard and recorded by the defendants. On November 19, 1979, when Ms. Adams gave the defendants the origi-

nal affidavits (including one from Mr. Bascom), the defendants accepted the documents. Passive receipt of such documents does not violate constitutional safeguards.

■ Plaintiffs contend that dialogue concerning the mailing list seized by Ms. Adams reflects governmental encouragement and acquiescence. On November 13, 1979, Ms. Adams met with defendants and provided them with a list, consisting of one hundred thirty-one pages and between 500 and 1000 names. The meeting was recorded. In response to a question from defendant Pixley as to whether the list is "trash", Ms. Adams explained:

> Those are, are trash copies—in essence. Uh, it'll be a trash copy. I copied those off, but they're, they will be trash copies after I type 'em on this sheet.

In response to a question from defendant Lovell as to what the list of names represents, Ms. Adams explained:

> These names are, are people that one, belong to the National Commidity group; two, they're Posse members—Posse Comitatus; uh, three, they're instructors, or teachers, and they're all tax strikers, and to be on this list, they must not have paid any income taxes.

Ms. Adams also stated:

> I was trying to get those out so fast today (laughs) I didn't care how they came out (laughs) was gonna say you people can put 'em in order.

Toward the end of the meeting, defendant Lovell stated to Ms. Adams:

> You're doing a good job; just excellent ... keeping this trash rolling in.

Defendant's off the cuff remarks to Ms. Adams, who apparently enjoyed her private investigative efforts, must not be taken out of context. The defendants consistently instructed Ms. Adams to only bring them the items placed in the trash by Mr. Grandbouche or by NCBA employees.

On December 19, 1979, Ms. Adams met with defendants Pixley and Lovell to examine items removed by Ms. Adams from NCBA offices. The following conversations were recorded at that meeting:

PIXLEY: Let me ask you another one. Here's something that says JERRY books, Craig, 13 books.

ADAMS: Right, he was holding a class over there at Craig.

PIXLEY: Oh, 13 students, huh.

ADAMS: Uh-huh.

PIXLEY: When you gonna get me the list of them?

\* \* \* \* \* \*

PIXLEY: In a nutshell, huh? Is that a prospectus?

ADAMS: Pardon?

LOVELL: The American Law Association presents for additional discussion and analysis the Workshop Principles.

ADAMS: Now those are out of order, deliberately. Punched on the wrong side deliberately. Thrown in the trash.

PIXLEY: Sun-of-a-gun. Tell you, you can't hardly get good secretarial help any more.

ADAMS: Laughter.

LOVELL: How about that.

PIXLEY: Trash, trash, dog gone, just creating trash.

ADAMS: You just don't give that out to anybody.

\* \* \* \* \* \*

ADAMS: That's, ah, DON's handwriting. But see, those aren't in order.

PIXLEY: A limited power of attorney.

ADAMS: But there in, I mean, you know, I, I had to do that in such a way so I could it thrown in the trash.

LOVELL: Good thinking.

ADAMS: I'm sorry about that.

LOVELL: Where did you get this? It doesn't matter?

ADAMS: Doesn't matter on that. A big box.

\* \* \* \* \* \*

LOVELL: Oh he was, how do you know that?

ADAMS: Cause that was on the original uh, uh scope.

LOVELL: Oh it was?

ADAMS: Um-hum.

LOVELL: Piece of paper.

ADAMS: Um-hum.

LOVELL: Is it still available?

ADAMS: Um-hum.

\* \* \* \* \* \*

LOVELL: Is there a file in there for the Commodity Bar, Barter Association or the Two hundred Thousand on a guy name Applegar?

ADAMS: Um, I don't remember that, but I ...

LOVELL: You have never heard of it?

ADAMS: I've heard the name from other sources, that you know, from reading the paper but uh, I've heard, well in that blue book there's uh, which I haven't been able to get out, cause it can't go in the trash, that has maybe three hundred names in it or better.

LOVELL: Blue book?

PIXLEY: What's that suppose to be?

ADAMS: That part of the, it's a barter and, and, uh, uh, people that he's actually dealing with. Now that, I've looked in it and HUDSON's name is, I mean uh, HOLMAN's is not in that. But it's all these other people that he has coming to his house.

LOVELL: What do mean he has additional name, names in addition to the what the ones we already know about?

ADAMS: Yes. It's a book.

PIXLEY: Where does he keep the blue book?

ADAMS: It's a ledger, it's in the, it's in the file drawer. And pulls that out every once in a while, but it's a book just about like so and it's about 4 by 5 cards you know 4 by 5 cards, ledger cards.

LOVELL: What happens?

PIXLEY: He leaves it there when he's out of town?

ADAMS: Yes.

PIXLEY: When DON's out of town?

ADAMS: Um-huh.

PIXLEY: Now it's probable going to end up in the trash, isn't it?

ADAMS: Okay.

\* \* \* \* \* \*

LOVELL: Okay, you got anything else for us?

ADAMS: No, what do I do now?

LOVELL: Oh.

PIXLEY: You want me to tear those pages out of there?

ADAMS: Pardon?

PIXLEY: Tear those pages out of there.

ADAMS: Can I duplicate 'em?

PIXLEY: Yeah, okay.

ADAMS: Will that be alright?

PIXLEY: Yeah.

LOVELL: Aaaaa.

ADAMS: If not I can tear 'em out.

PIXLEY: Na, that's alright, go ahead wait to fill your book up, and throw it away.

ADAMS: And then throw it away.

C.

The conversations among Ms. Adams and defendants contained language which could be construed, if taken out of context, to infer some degree of governmental acquiescence or encouragement. However, the employee/agent of Mr. Grandbouche was the informant, and the acquiescence or encouragement necessary to implicate the government takes something more than passive acceptance or silent submission. To the extent the defendants made off-the cuff remarks to Ms. Adams during their meetings, such casual comments reflect the natural tone one might expect from agents conversing with an informant. Defendants' comments do not negate the voluntariness with which Ms. Adams came forward with information and documents. Governmental law enforcement agents are not required to refuse to accept information propounded by a voluntary informant who obtains information in a private employment capacity and conducts a private search. *Cf. United States v. Snowadzki,* 723 F.2d 1427, 1429–30 (9th Cir.1984).

The transcripts of the tape recorded meetings, excerpted above, do not establish the existence of an agency relationship between Ms. Adams and the IRS/CID. De-

fendants, throughout their relationship with Ms. Adams, did not direct or encourage her to conduct a search of NCBA offices or to seize any documents from Grandbouche or NCBA. They repeatedly admonished her not to create trash. Ms. Adams acted without pay, on what only can be described as altruistic motives. Government agents were neither promoters nor architects of the manner or extent to which Ms. Adams forwarded information to the agents.

The use of informants in governmental investigations is an essential tool for enforcing federal laws. The defendants' conduct, including their few casual remarks, in receiving information from an unpaid informant did not constitute impermissible acquiescence or encouragement within the meaning of *United States v. Lamport,* 787 F.2d 474, 476 (10th Cir.1986).

Plaintiffs did not carry their burden of proving that Ms. Adams was the agent of the IRS/CID, and thus her conduct cannot be imputed to the defendants. The private search was legal; the defendants did not violate any constitutional rights or privileges of the plaintiffs.

### V.

Even if we concluded that Ms. Adams was the agent of the government, defendants still are entitled to summary judgment as a matter of law. The doctrine of qualified immunity shields each of the defendants from liability for their actions in the investigation.

### A.

Defendants claim that they are entitled to either absolute or qualified immunity from damages liability. Defendants analogize their roles as IRS/CID investigators to the role of a prosecutor in a criminal action or in a grand jury investigation. Defendants argue that they worked under the control of a prosecutor and thus functioned in a quasi-judicial fashion, entitling them to absolute immunity. Alternatively, defendants contend that they are entitled to qualified immunity because they did not violate clearly established constitutional rights which a reasonable investigator would have known.

Defendants are not entitled to absolute immunity. Prosecutors enjoy absolute immunity from damages liability when their actions are intimately associated with the judicial process. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Similarly, agency officials charged with initiating or continuing an administrative enforcement proceeding are accorded absolute immunity. *Butz v. Economou,* 438 U.S. 478, 515–16, 98 S.Ct. 2894, 2915–16, 57 L.Ed.2d 895 (1978). Nothing in *Imbler* or *Butz* suggests that prosecutorial absolute immunity extends to actions of investigators prior to the initiation of a grand jury investigation. We do not reach the question whether absolute immunity extends to an investigator's activities after a grand jury has been impaneled.

In the circumstances of this case, however, qualified immunity is an available defense.

[O]fficials performing discretionary functions are generally shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known.

*Anthony v. Baker,* 767 F.2d 657, 664 (10th Cir.1985), following *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See also Brierly v. Schoenfeld,* 781 F.2d 838, 843 (10th Cir.1986).

*Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), significantly changed the doctrine of qualified immunity. Prior to 1982, precedent required both a subjective and an objective element in deciding whether the affirmative defense of qualified immunity operates as a bar to suit against government officials. A defendant had the burden of proving that he acted in a good faith belief that his actions were proper (the subjective element) and that his belief was reasonable (the objective element). *Bivens v. Six Un-*

*known Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (adopting rationale of *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

In *Harlow,* the Supreme Court eliminated the subjective, or good faith, element of the test. Under *Harlow,* then, qualified immunity is established if it is proven that there was no violation of clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow, supra,* 457 U.S. at 817, 102 S.Ct. at 2737. The rationale behind the rule is that a government official has no duty to anticipate unforeseeable constitutional developments. The Supreme Court also spelled out the proposition that the usual disposition of a constitutional tort case should be by summary judgment, and that "until this threshhold immunity question is resolved, discovery should not be allowed". *Id.* at 818, 102 S.Ct. at 2738. Under *Harlow,* qualified immunity insulates federal agents from insubstantial lawsuits and from the necessity of trial. It is "an *immunity from suit* rather than a defense to liability". *Id.* (emphasis in original).

*Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), extended the principle enunciated in *Harlow.* In *Davis,* a civil rights case against state officials, the Court held that the *Harlow* test of qualified immunity is applicable even when the conduct of the government official violates a state administrative regulation. In sum, if the right is not "clearly established" as a matter of constitutional law, the official is immune even if actions violated administrative or statutory direction.

The *Harlow* Court directed further that even if the trial court determines that the constitutional rights at issue were clearly established, the defendant can still prevail if he establishes "extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard...." *Id.* 457 U.S. at 819, 102 S.Ct. at 2738.

The defense of qualified immunity varies coextensively with the conduct of the official and the objective knowledge of a reasonable person in the shoes of the official. Accordingly, we address independently the extent to which immunity is available to each defendant.

## B.

Defendants Lovell, Pixley, and Hyatt are entitled to the defense of qualified immunity. They did not violate any *clearly established* constitutional rights. Ms. Adams' actions may have violated the constitutional rights of Mr. Grandbouche, NCBA, and, by implication, plaintiffs. However, defendants did not violate any clearly established constitutional rights by imputing Ms. Adams' activities to them. As Ms. Adams' liability is not in issue here, we will not decide whether Ms. Adams herself violated defendants' constitutional rights.

Plaintiffs claim that defendants, through and in conjunction with Ms. Adams, violated plaintiffs' fourth amendment rights to be free from unreasonable searches and seizures. Plaintiffs complain that the documents and other things removed from NCBA offices were items in which plaintiffs had an expectation of privacy. Defendants argue that only three items were taken which were not in the trash. Those items were not used by the IRS/CID in their investigation. Additionally, defendants claim that plaintiffs have no expectation of privacy in trash.

It is well settled that "[t]here is no reasonable expectation of privacy in discarded trash which has been out for collection". *United States v. Grabow,* 621 F.Supp. 787, 794 (D.Colo.1985). *See United States v. Mustone,* 469 F.2d 970, 972 (1st Cir.1972); *United States v. Terry,* 702 F.2d 299, 309 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Reicherter,* 647 F.2d 397, 399 (3d Cir.1981); *United States v. Crowell,* 586 F.2d 1020, 1025 (4th Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979); *United States v. Vahalik,* 606 F.2d 99, 101 (5th Cir.1979), *cert. denied,* 444

U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980); *Magda v. Benson,* 536 F.2d 111, 112 (6th Cir.1976); *United States v. Kramer,* 711 F.2d 789, 791–94 (7th Cir.), *cert. denied,* 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983); *United States v. Shelby,* 573 F.2d 971, 973–74 (7th Cir.), *cert. denied,* 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978); *United States v. Michaels,* 726 F.2d 1307, 1312–13 (8th Cir.), *cert. denied,* 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984); *United States v. Jackson,* 448 F.2d 963, 971 (9th Cir.1971), *cert. denied,* 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972); *cf. United States v. Thornton,* 746 F.2d 39, 49 n. 11 (D.C.Cir. 1984). Courts generally have ruled that trash indiscriminately left for collection is presumed abandoned. *Id.*

However, evidence indicating an intent to retain some control over or interest in discarded trash refutes the inference of abandonment and establishes an intention to retain a privacy interest in the discarded material. *See United States v. Terry,* 702 F.2d 299, 309 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *cf. United States v. Michaels,* 726 F.2d 1307, 1313 (6th Cir.), *cert. denied,* 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984) (special arrangements for disposition of trash infer privacy); *United States v. Crowell,* 586 F.2d 1020, 1025 (4th Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979) (special arrangements infer privacy). The Second Circuit has noted:

> In the rare instance where he desires to preclude inspection by others of private papers in his garbage he may do so by first shredding or burning them or by hand-delivering the papers to a garbage-grinding machine.

*United States v. Terry,* 702 F.2d 299, 309 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). ▪ None of the cases cited held that the complaining party had retained an expectation of privacy in the trash. Arguably, a logical extension of the cases would dictate that a person who specifically instructs another person to take trash home and burn it thereby retains an expectation of privacy in the trash. However, no court has viewed or extended the law in that manner, and we decline to do so. In determining the applicability of the qualified immunity doctrine, we need not extend the scope of constitutional safeguards. We need only determine whether the constitutional rights asserted by the plaintiffs are clearly established. We hold in this case that they are not.

A reasonable government agent, based on the state of the law, would believe that trash is trash, and that no constitutional right to privacy attaches to trash. Government agents are not required to anticipate extensions of constitutional law. Defendants Lovell, Pixley, and Hyatt performed discretionary functions within the scope of their responsibilities with the IRS/CID. Their conduct did not violate "clearly established statutory or constitutional rights which a reasonable person would have known". *Anthony v. Baker,* 767 F.2d 657, 664 (10th Cir.1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Consequently, defendants Lovell, Pixley, and Hyatt are qualifiedly immune from civil liability in this action.

## ORDER

In view of our holding here, we need not question the measure of damages; as such, the case in its entirety is dismissed. ACCORDINGLY, defendants' Motion for Summary Judgment is GRANTED, and plaintiffs' Motion for Summary Judgment is DENIED. The case is DISMISSED WITH PREJUDICE. All parties shall pay their own costs and attorney fees. The Clerk of the Court is DIRECTED to enter judgment in favor of the defendants on all counts, in accordance with this Memorandum Opinion and Order.